**BOSE CORPORATION, Plaintiff,**

v.

**CONSUMERS UNION OF U. S., INC., Defendant.**

Civ. A. No. 71–481–J.

United States District Court, D. Massachusetts.

Jan. 21, 1981.

Blair L. Perry, Joseph E. Riley, Jr., Hale and Dorr, Boston, Mass., Charles Hieken, Waltham, Mass., for plaintiff, Bose Corp.

Marshall Beil, Michael Pollet, Karpatkin, Pollet, Delibert & Beil, New York City, Nancy Gertner, Silverglate, Shapiro & Gertner, Boston, Mass., for defendant, Consumers Union of U. S., Inc.

## OPINION

JULIAN, Senior District Judge.

The plaintiff, Bose Corporation (Bose), a manufacturer of loudspeaker systems and other audio equipment, brought this civil action in 1971 against the defendant, Consumers Union of United States, Inc. (CU), a consumer product-testing organization, alleging product disparagement, unfair competition, and violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1976). Jurisdiction was based on diversity of citizenship, 28 U.S.C. § 1332(a)(1), and on the Lanham Act, 15 U.S.C. § 1121 and 28 U.S.C. § 1338(a) and (b). The lawsuit was

precipitated by the publication of a review of the plaintiff's product, the Bose 901 Series I loudspeaker system, (the Bose 901), which appeared in the May 1970 issue of the defendant's publication, *Consumer Reports.*

After an exceedingly protracted period of pretrial discovery [1] the Court severed the issue of damages from the other issues in the case and ordered that a trial be held on the issue of damages only if the plaintiff prevails on the remaining issues. The Court then conducted a non-jury trial which concluded after nineteen days of testimony.[2] This opinion constitutes the Court's findings of fact and conclusions of law as required by Rule 52 of the Federal Rules of Civil Procedure. Further findings of fact and conclusions of law on the issue of damages will be made after the trial on damages is held.

## THE PARTIES

### Plaintiff

The plaintiff, Bose Corporation (Bose), is a corporation organized under the laws of the State of Delaware and having its principal place of business in Framingham, Massachusetts. It was organized in 1964 under the laws of the Commonwealth of Massachusetts and became a Delaware corporation by merger in December, 1978. When this action was commenced on February 23, 1971, the plaintiff was a Massachusetts cor-

poration and had its principal place of business in Natick, Massachusetts.

Dr. Amar G. Bose (Dr. Bose) is the founder, principal owner, and chief executive officer of the plaintiff corporation. The name of the plaintiff corporation is derived from the surname of Dr. Bose. Dr. Bose is also the inventor of the Bose 901, the product involved in this action.

Dr. Bose received his Bachelor of Science degree and his Master of Science degree from Massachusetts Institute of Technology (M.I.T.) in 1952 and his Doctor of Science degree from the same institution in 1956. He has been a member of the faculty of M.I.T. in the Department of Electrical Engineering since 1956. He is the co-author of a textbook entitled *Introductory Network Theory.* For the purposes of this action the defendant concedes that he is an expert in the field of loudspeaker design.

The Bose 901 system was designed by Dr. Bose in 1967. The system consists of two loudspeaker cabinets, an electronic device called an "active equalizer," and necessary wiring and connections. Each of the cabinets is of pentagonal shape when viewed from above, being designed to have one side (the front face) facing toward the listener and two other sides (the rear faces) facing away from the listener. The two rear faces join at an angle in the rear of the cabinet to form a "V". The front face contains a

1. Without seeking to apportion responsibility for the profusion of filings in this case, the Court simply notes that the files generated in this case by only two parties are now well over one foot in depth.

2. During the course of the trial the Court deferred its rulings on two evidentiary questions:
   1) The admissibility of DX–AB (warranty registration cards); and
   2) The admissibility of testimony by Dr. Bose concerning a letter dated December 12, 1964, which was written by Arnold L. Seligson to a patent attorney. Tr. 3–67 through Tr. 3–75.
   After further consideration of the arguments and the memoranda of counsel, the Court overrules the plaintiff's objection to DX–AB and rules that DX–AB be admitted into evidence. The Court also overrules the defendant's objection to the admission of Dr. Bose's testimony concerning the Seligson letter because the ob-

jection bears only on the weight to be given to that testimony, not on its admissibility.

References in this Opinion to documents filed in this case will be made in the following manner. Plaintiff's and Defendant's Exhibits will be referred to by the notation "PX" or "DX" followed by the exhibit number. Transcript pages will be referred to by the notation "Tr" followed by the appropriate page number. The "Stipulation of Undisputed Facts," filed by the parties at the beginning of the trial, will be referred to as "Stip. A." In that stipulation the parties stipulated that there was no dispute as to certain facts set forth in "Plaintiff's Requested Findings of Fact (Before Trial)" and in "Defendant's Statement of Uncontested Facts." Therefore all references to Stip. A will be followed by the notation PRFOF or DSOUF, followed by the appropriate paragraph number.

single driver.[3] Each of the two rear faces contains four drivers. The nine drivers are of equal size. Because of this configuration of drivers within the Bose 901 cabinets, each Bose 901 loudspeaker radiates one-ninth of the sound directly into the listening area, and eight-ninths of the sound into the listening area after reflection off one or more walls. The shape of the Bose 901 cabinets and the design of the Bose 901 system as a whole are unique and unconventional.

The Bose 901 was first marketed in late 1967 or early 1968. In 1968 Bose began to advertise and extensively promote the Bose 901. Bose published advertisements promoting the Bose 901 in the national consumer high fidelity magazines[4], in national general publications[5], and in other publications.

A significant portion of the Bose marketing efforts was directed toward soliciting reviews of the Bose 901 by professional reviewers. Bose obtained the right to reprint such reviews and distributed reprints of the reviews as part of its promotional campaign.[6]

### Defendant

The defendant, Consumers Union of United States, Inc. (CU), is a not-for-profit corporation organized and existing under the laws of the State of New York and having its principal place of business in Mount Vernon, New York. CU was organized in 1935. When this action was commenced, CU had its principal place of business in Mount Vernon, New York.

From May 1936, to date, CU has published a magazine called *Consumer Reports*, in which information about the quality, characteristics, and prices of various consumer products is set forth. At all times relevant to this action, *Consumer Reports* has been published on a monthly basis. *Consumer Reports* is distributed by mail to subscribers and is sold on newsstands.

The influence of *Consumer Reports* on consumers' buying decisions is substantial. During 1970 and 1971 *Consumer Reports* and CU had a very favorable reputation for independence, integrity, accuracy, and freedom from bias. Subscribers to *Consumer Reports* tend to make buying decisions relative to consumer products after consulting reports published in *Consumer Reports*, among other sources, and in 1970 millions of readers relied upon the product information published in the magazine. Many consumers would not think of making a substantial purchase without consulting *Consumer Reports*.

### The Consumer Reports Article

On pages 272 through 279 of the May 1970 issue of *Consumer Reports.* CU published an article entitled "Loudspeakers" (the Article). The Article contained CU's evaluation of the quality and performance of twenty-four different loudspeakers based on CU's tests of the loudspeakers. In a section (the Bose 901 Portion) boxed off from the main body of the Article, under the heading "Some loudspeakers of special interest," appeared the following comments about the Bose 901:

Some loudspeakers of special interest

**BOSE 901.** No loudspeaker design has ever really captured the realism of live concert hall sound, although many designers have tried. The *Bose 901* system (The Bose Corp., Natick, Mass.) takes an interesting shot at realism. The concept behind the *Bose* system is based on the contention that in an actual concert hall most of the sound you hear has been bounced from the walls;

---

3. A driver is the element within a loudspeaker that physically displaces air in order to produce sound. Stip. A, PRFOF 22.

4. Bose advertised in *High Fidelity, Stereo Review, Audio, Hi-Fi Buying Guide*, and *American Record Guide*, in addition to other high fidelity magazines. Stip. A, DSOUF 16.

5. Bose advertised in *Saturday Review, Rolling Stone, Playboy*, and other publications with nationwide distribution. Stip. A, DSOUF 16.

6. Bose estimates that it distributed to the general public at least 1,000,000 copies of each of at least seven reviews that it reprinted. Stip. A, DSOUF 26.

it does not come directly from the orchestra. Therefore, the *Bose 901* speaker system directs only about 10 per cent of its output toward the listener and bounces the other 90 per cent from the wall. The *Bose 901* system comes as a package with two speaker systems and an electronic equalizer that can be easily connected to your amplifier. The package is priced at $476 ($496 on the West Coast).

Each speaker cabinet contains nine small (five-inch) speakers. Small speakers tend to reproduce high frequencies more efficiently than low frequencies. But so many speakers together in each cabinet help to reinforce bass tones, and help to disperse the sound more evenly. The electronic equalizer is intended to further compensate for the relatively low bass efficiency of small speakers, to compensate for the loss of treble when sound is reflected from the walls, and thus to help provide a uniform overall response. The active equalizer can be adjusted, within limits, to vary the sound to individual taste.

To determine what effect the system has on stereo reproduction, CU's engineers made a special tape, in the anechoic chamber, of a cricket-like noise-maker moving from extreme left to extreme right. We played the tape through the *Bose* system in our listening room and asked a panel to judge the direction from which the sound appeared to come. For comparison, the panel also listened to the same tape through a pair of *ADC 303AX* speakers, check-rated in the accompanying report. The panelists were able to locate the sound accurately from both the *ADC* and *Bose* systems when they sat directly between the speakers, but not when they sat at either the extreme left or extreme right. So, at least for pinpointing sharp noises, there appeared to be no difference between the speaker systems.

We repeated the experiment using a variety of stereo records. When it came to music, the panelists immediately noted a remarkable difference between the systems. The *Bose 901* seemed considerably more spacious and reverberant, actually to the point of giving the impression that the wall of the listening room had ·dropped away. The effect was rather dramatic and was felt from any listening position.

But after listening to a number of recordings, it became apparent that the panelists could pinpoint the location of various instruments much more easily with a standard speaker system than with the *Bose* system. Worse, individual instruments heard through the *Bose* system seemed to grow to gigantic proportions and tended to wander about the room. For instance, a violin appeared to be 10 feet wide and a piano stretched from wall to wall. With orchestral music, such effects seemed inconsequential. But we think they might become annoying when listening to soloists. On an impulse, we also played some monophonic records through the *Bose*. To our surprise, they too acquired the same spacial openness and size distortions as the stereo records.

As for sound quality, if the *Bose 901* had been rated with the main group of tested speakers, it would have fallen between the high- and medium-accuracy groups. The overall sound was of good quality with impressive bass, considering the small speakers. But the combination of the equalizer and the speakers tended to overemphasize the middle bass, giving it a somewhat overly full, heavy sound.

We think the *Bose* system is so unusual that a prospective buyer must listen to it and judge it for himself. We would suggest delaying so big an investment until you were sure the system would please you after the novelty value had worn off. If you do consider buying the system, note well this fact: The *Bose* requires a rather gigantic amount of power. CU recommends you have an amplifier of 50 watts per channel for the deepest bass response.

A brief summary of the Bose 901 Portion of the Article was published by CU in the December 1970 "Buying Guide Issue" of *Consumer Reports*.[7]

### CU Personnel

The testing project that led to the publication of the Article involved a number of CU personnel, but the persons who were primarily responsible for the Bose 901 Portion of the Article were Arnold L. Seligson and Alan Lefkow. Seligson was the senior project engineer on the loudspeaker testing project and Lefkow worked as a project engineer under the immediate supervision of Seligson.

Seligson received a bachelor's degree in electrical engineering from the City College of New York in 1957. He took additional courses leading toward a master's degree in electrical engineering during the years 1953–1956, but discontinued his studies for personal reasons and never attained a master's degree. He also took a course in acoustics at Brooklyn Polytechnic Institute in 1953.

From 1952 to 1956, Seligson worked for the United States Naval Materiel Laboratory, where much of his work involved measurement and evaluation of loudspeakers. In July 1956 Seligson was employed by CU as a project engineer. In 1961 he left CU to work for another corporation. He re-turned to CU in 1963 as a senior project engineer and remained a CU employee to the time of trial. Seligson became chief of CU's electronics division in 1974 and held that position at the time of trial. While an employee of CU, Seligson has done extensive work on testing of loudspeakers. He has been testing and evaluating loudspeakers for more than 25 years.

Alan Lefkow was first employed by CU at the end of September 1969, just before the loudspeaker testing project began. He was employed as a project engineer in the electronics division and worked on the loudspeaker testing project under Seligson's supervision. Before joining CU Lefkow had received a bachelor's degree in electrical engineering from the City College of New York in 1965 and a master's degree from Columbia University in the same field in 1968.

### CU's Expert Witness

Dr. David M. Green testified as an expert witness for CU. Dr. Green is the Chairman of the Department of Psychology and Social Relations at Harvard University, where he is a professor of psychophysics. He received a bachelor's degree in liberal arts from the University of Chicago in 1952, a bachelor's degree in psychology from the University of Michigan in 1954, and a doctoral degree in psychology from the University of Michigan in 1958. He has taught courses in psychoacoustics at various universities; is the author of a large number of publications in the field of psychoacoustics; has written a text book entitled *An Introduction to Hearing*; is the president-elect of the Acoustical Society of America; and was acknowledged by the plaintiff to be an expert in the field of psychoacoustics.[8]

---

7. Each December issue of *Consumer Reports* is in the form of a paperback book of approximately 400 to 450 pages, called the "Buying Guide Issue" of *Consumer Reports*. The "Buying Guide Issue" contains information reprinted from prior issues of *Consumer Reports* which have been published over a period of several years. Stip. A, PRFOF 5.

8. Dr. Green defined psychoacoustics as being the study of "acoustics as it relates to reactions of people hearing sound." Acoustics is the study of the physical properties of sound and does not generally involve the human observer. Psychoacoustics deals with "what people hear and the mechanism by which they hear it." Psychoacoustics, a branch of psychophysics, is

### The Loudspeaker Tests

CU's loudspeaker testing project began in the spring of 1969 with the preparation of three marketing reports by CU's Marketing Services Department. These reports were used in selecting the loudspeakers which were to be tested. A total of twenty-four of the loudspeakers listed in the marketing reports were eventually selected for testing.

The primary purpose of the loudspeaker project was the evaluation of medium-priced loudspeakers, generally those with a retail price of from $80 to $150 per speaker. The Bose 901, which consisted of two loudspeaker cabinets and an active equalizer, was priced at $476 and was thus not a medium-priced loudspeaker system. Nevertheless, Seligson and other CU employees decided to include the Bose 901 in the testing project because of the wide reputation it had achieved in the industry and because of the unusual claims made on its behalf by its manufacturer. Seligson was directly involved in the initial discussions concerning the inclusion of the Bose 901 in the testing project. Seligson also completed a "Test Sample Requisition" to be prepared for the purchase of several loudspeakers, including the Bose 901. The decision to include the Bose 901 in the testing project required the approval of Seligson's superiors—Karl Nagel, Chief of the Electronics Division; Monte Florman, acting (associate) technical director, and John Hanc, head of the Marketing Services Department. Seligson expected that the "Test Sample Requisition" which he had prepared would, in the normal course of events, be approved and it was in fact approved by Seligson's superiors.

The loudspeaker tests that provided the basis for the evaluations made in the Article began in September 1969. Seligson was in charge of the testing and planned the tests. He did some of the testing work himself, and supervised the work of Lefkow and two assistant project engineers who were assisting in the testing work. When the testing was completed, Seligson analyzed the results and prepared, with Lefkow's assistance, a report to CU's editorial department which report formed the basis of the Article.

Each of the twenty-four loudspeakers was put through a basic battery of tests. The loudspeakers were first put through a number of "objective" tests and measurements.[9] They were then subjected to an "A–B listening test," a test which was designed to evaluate the "accuracy" of the loudspeakers. The "A–B listening test" was described in the Article as follows:

> To supplement the quantitative measurements we made of the loudspeakers in the anechoic chamber and the listening room, we put each speaker through a carefully designed listening-panel test. We first selected a speaker we knew provided a wide, smooth frequency response; that became the "reference speaker." We played a wide variety of music through that speaker in the anechoic

---

a discipline that lies on the border of physics and psychology. Tr. 14–5.

**9.** The following objective tests were performed:
1) Measurements such as height, depth, length, color, etc. were made by simple observation of the loudspeaker cabinet itself.
2) Electrical characteristics, such as admittance, were measured both before and after a break-in period.
3) The electrical impedance was measured.
4) Frequency response was measured in an anechoic chamber and in CU's listening room.
5) The low frequency response was measured in an anechoic chamber.
6) Total harmonic distortion was measured.
7) The polar response of the loudspeakers was measured. Tr. 7–3, 4.

A portion of the evidence produced at trial concerned the disconnection of one of the drivers in one of CU's Bose 901 loudspeakers. The plaintiff argues that the defendant tampered with the loudspeaker in order to alter subsequent test results. The Court shares the plaintiff's concern that the evidence in this case may have been tampered with at some time. Nevertheless, the Court is satisfied that CU's Bose 901 loudspeakers were in proper working condition at the critical time—when they were tested in 1969 and 1970. The impedance measurements taken in 1969 confirm that all the drivers were functioning at that time. If someone did tamper with the loudspeaker at a subsequent time it would, of course, be reprehensible, but it would not affect the Court's analysis of the evidence.

chamber and recorded the output of the speaker on one track of a master tape. At the same time, we recorded the music directly on the second track of the master tape, without playing it through the speaker.

The reference speaker was then set up in the listening room, hidden from view of the listening panel. The music recorded on the *second* track of the master tape (that is, the music recorded directly from the source) was played through the reference speaker. The speakers under test were set up two at a time, also out of view of the panelists. The music recorded from the *first* track of the master tape (that is, the music recorded from the reference speaker) was played through the speakers under test. Under those conditions, then, a test speaker that reproduced music with absolute fidelity would sound exactly the same as the reference speaker.

The panelists were asked to judge which one of the two test speakers produced a sound that was, overall, closer to that of the reference. (We could, of course, switch back and forth between the reference speaker and the test speakers almost instantaneously.) The listeners were told emphatically *not* to base their judgments on which speaker seemed "better" for music or which they "liked" better, but merely to say which was more faithful to the reference sound. At the same time, by asking the listeners to match the loudness of the speakers under

test, we determined the amount of average sine-wave power required for each speaker to produce the same loud sound in a 3000-cubic-foot room. That figure provided a good comparison of the effective relative efficiency of the speakers.

CU's statistical analysis of the results of the A–B listening test revealed that the Bose 901 should be ranked in the "middle accuracy group" of loudspeakers. Because he felt that the results of this test were unfair to the Bose 901 [10], Seligson placed the Bose 901 "between the high- and medium-accuracy groups."

After the objective tests and the A–B listening test were conducted, the Bose 901 was subjected to two additional "special tests." [11] The first "special test," the cricket test, was described in the May 1970 *Consumer Reports* Article as follows:

To determine what effect the system has on stereo reproduction, CU's engineers made a special tape, in the anechoic chamber, of a cricket-like noise-maker moving from extreme left to extreme right. We played the tape through the *Bose* system in our listening room and asked a panel to judge the direction from which the sound appeared to come. For comparison, the panel also listened to the same tape through a pair of *ADC 303AX* speakers, check-rated in the accompanying report.

It was Seligson's idea to conduct the cricket test and it was Seligson who designated the Bose 901 for inclusion in the cricket test. [12]

10. Seligson felt that the A–B listening test worked to the disadvantage of the Bose 901 because that test only asked the listening panel to judge whether the tested loudspeaker sounded similar to the reference loudspeaker, which was a conventional, forward-radiating loudspeaker. Seligson thought that because "the Bose 901 had a type of aural space that was different from the forward-radiating loudspeakers ... such a difference would crop up unfavorably to the disadvantage of the Bose." Tr. 11–71.

11. The Bose 901 and the Harman-Kardon HK–50 loudspeakers were chosen for the "special listening test" because of the special sound characteristics that were claimed in their behalf by their manufacturers. No other tested

loudspeakers were subjected to the "special listening test." Tr. 13–126, 127, PX–9. The "special listening test" conducted on the HK–50 loudspeakers was discontinued very quickly because no unusual auditory effects were noted when listening to them. Tr. 7–101, 102.

12. CU contends that the cricket test was conducted on January 20, 1970. The plaintiff, on the other hand, contends that the cricket test never took place and that the results of the test were entirely fabricated by Seligson and Lefkow. To support this contention the plaintiff relies on a weekly progress report (PX–23) for the loudspeaker testing project, dated January 14, 1970, which states, "All tests finished" on the same line as the figures "2/1". The plaintiff argues that this statement indicates that all

The second "special test," the "special listening test," was also Seligson's idea. The "special listening test" consisted simply of Seligson and Lefkow recording their personal observations after listening for several hours to a variety of records played through the Bose 901. Seligson selected himself and Lefkow to be the "panelists" for the "special listening test" because he felt they would be the appropriate parties to make the subjective judgments that were called for by this test.

### The Seligson Patent

In the summer of 1964, Seligson conceived of an idea for utilizing an electrical discharge in order to produce sound. He envisioned the primary application of his idea to be a device which could be used as a loudspeaker.[13] In the fall of 1964 Seligson and Robert S. Lanier, a fellow CU employee, began work on the development of a loudspeaker using Seligson's idea. They built several models of the loudspeaker and discovered that the concept worked. Their models produced audible sound. The sound, however, was produced at very low levels, was distorted, and was accompanied by the production of ozone when the models were in operation.

In late 1964, Seligson and Lanier decided to attempt to obtain a patent on the new loudspeaker and retained a patent attorney named Robert W. Fiddler for that purpose. They called their invention the "Ionoflow Loudspeaker," and in describing it to Fiddler, Seligson wrote:

"Above all, the Ionoflow can, we believe, be made into the first truly full-range, high efficiency, low-distortion speaker in a fiarly (sic) small form."[14]

Seligson believed that language to be an accurate description of the invention at the time.

An application for a patent on the invention was signed by Seligson and Lanier on April 8, 1966, and filed in the United States Patent Office on April 26, 1966. At that time Seligson still thought that his invention might have commercial potential despite its problems of inadequate sound volume, distortion, and ozone production. Seligson did not work on the invention at all from 1967 until spring of 1970. He was discouraged by the problems encountered in building a good, working model and became gradually disillusioned about the prospects of future commercial exploitation of his idea.

On May 5, 1969, Fiddler wrote to Seligson to inform him that notice had been received from the United States Patent Office that a patent would issue on the application. On

tests on the loudspeaker testing project were completed by January 14, 1970, six days before the cricket test supposedly took place. Therefore, according to the plaintiff, the cricket test, if it took place at all, was conducted after the testing project had already been concluded, and the results of such a test could not have formed a basis for the text of the Article. CU contends that the figures "2/1" indicate that the author of the report projected that all tests would be finished by February 1, 1970.

The plaintiff also relies on the fact that the cover of the project data book (PX–9) containing the results of the cricket test bears the notation 12/20/70 on a line following the words "Date Started." Since the Article was published in May 1970, any data generated in December 1970 or thereafter could not have formed the basis of statements contained in the Article. CU contends that Lefkow incorrectly transposed the date 1/20/70, and wrote 12/20/70 on the cover of the project data book instead. The plaintiff further relies on the failure of the defendant to produce the "cricket tape" which the defendant allegedly used in the cricket test.

After carefully considering the foregoing evidence, the Court finds that the cricket test did indeed take place. The Court does not consider the inconsistencies pointed out by the plaintiff to be particularly significant, especially in view of the witnesses' detailed description of both the tape and the test and the conformity of that description with the description contained in the Article.

**13.** Seligson described his idea as follows:

These experiments are directed to the development of a loudspeaker which produces sound by (1) ionizing air molecules; (2) accelerating them in one direction by a high d–c potential, which accelerates the air, by collision effects, in the same direction; (3) modulating the air flow by modulating the potential applied, to produce sound. PX–12, p. 1.

**14.** Letter from A. L. Seligson to Robert W. Fiddler, stapled to p. 26 of PX–12.

November 4, 1969, during the same period of time CU was conducting its loudspeaker tests, United States Patent No. 3,476,887 was issued to Seligson and Lanier for their "Ionic Electro-Acoustic Transducer."

In April 1970 Seligson learned that Lanier had been approached by a man named Bertram Menden, who sought on behalf of a third party to acquire a license or rights under the patent. Menden was in reality a private detective retained by Bose to inquire into matters relating to the patent. Seligson obtained permission from Florman to enter into an agreement with Menden and then signed such an agreement (the Menden Agreement). He understood that the Menden Agreement granted to Menden or his undisclosed principal a right of first refusal for a license under the patent. Menden then paid $2,000 to Seligson and Lanier, which, under the terms of the Menden Agreement, was to be used only for the purpose of building a model of the invention. When Seligson and Lanier accepted the payment of $2,000, Seligson intended to build a model of the invention for Menden, and he and Lanier worked hard to do so. Seligson understood that if the model were satisfactory, Menden might seek a license under the patent. Despite their hard work, Seligson and Lanier were unable to complete a model because they ran out of funds prior to completion of the amplifier and power supply, an essential part of the device.

### Report to Editorial

Around the end of January 1970, after completion of the loudspeaker testing, Seligson and Lefkow prepared a draft "Report to Editorial" for use by the editorial department in preparing a manuscript of the Article. The portions of the "Report to Editorial" which dealt with the Bose 901 were drafted entirely by Seligson.[15] After re-

---

**15.** Compare the final version of the Bose 901 Portion of the Article as it appears on p. 4, *supra*, with Seligson's draft of the Bose 901 Portion as contained in the Report to Editorial:

"The Harman-Kardon HK–50 omnidirectional speakers, the Bose system and a pair of check-rated loudspeakers (ADC 303ax) were compared in an instantaneous A, B, C listening experiment to ascertain what effect the purported special sound radiation characteristics of the HK–50 and Bose systems have upon stereo reproduction. First, a special test tape was prepared in CU's anechoic chamber. This was a stereo recording of a small sharp-sounding noise maker ("cricket") as it moved in seven equal distinct steps from extreme left to extreme right. Listeners in CU's sound room were asked to judge the direction from which the sound appeared to come by listening to each of the three stereo systems when seated directly between the two loudspeakers—the ideal listening location—and when seated to the extreme side of the room. In all three cases, the listeners were able to accurately localize the sound when seated in the ideal listening position but were unable to accurately locate the sound when seated in the extreme listening position. From this experiment CU derives the conclusion that with respect to accurate stereo sound localization of distinct sharp noises, or clicks, at least, there is no significant difference between the conventional, omnidirectional or Bose concept of loudspeaker design.

"A second experiment was conducted. We repeated the A, B, C listening experiment this time using as program material, a wide variety of stereo records. Repeated observations from every position in the listening room discerned little or no difference between the Harman-Kardon and the conventional loudspeakers either with respect to accurate localization of instruments or with respect to overall impressions of the recording "space". Now, however, the Bose was outstandingly different from the other two systems. Sound from the Bose seemed considerably more spacious and reverberant with a greater feeling of ambiance, giving an effect equivalent to having the wall next to the speakers in the listening room drop away revealing a vastly more open acoustically live space beyond. After listening to a number of recordings this way, it became apparent that precise localization of musical instruments (as opposed to the sharp noised cricket of experiment 1 [the cricket test]) appeared to be inferior to that of the standard loudspeaker system even when the listener was seated in the ideal listening position for good stereo, but that the overall heightening of the acoustic ambiance held up well in just about any listening position. Continued listening revealed a number of other disturbing aspects to the Bose system. Instruments not only could not be placed with precision but appeared to suffer from giganticism and a tendency to wander around the room; a violin seemed about 10 ft. wide, a piano stretched from wall to wall, etc. These effects were entirely innocuous when listening to orchestral music but

view by Seligson's superiors the draft was forwarded to the editorial department. The Bose 901 Portion of the Article was based on the material written by Seligson in the "Report to Editorial."·

### Product Disparagement

The complaint in this case alleges a claim for relief for product disparagement.[16] In cases such as this, where the plaintiff is a corporation, product disparagement is sometimes confused with the closely related tort of corporate defamation. Conceptually the two torts are easily distinguishable. Defamation of a corporation injures the reputation of the corporation itself, while product disparagement injures the reputation of its products. *Dooling v. Budget Publishing Co.*, 144 Mass. 258, 10 N.E. 809 (1887); *Marlin Firearms Co. v. Shields*, 171 N.Y. 384, 64 N.E. 163 (1902).[17] In practice, however, the line between the two torts is often blurred because comments that disparage a product almost invariably reflect adversely on the manufacturer of the product as well. *Dooling v. Budget Publishing Co.*, 144 Mass. 258,

10 N.E. 809 (1887); W. Prosser, *Law of Torts* § 128, at 918 (4th ed. 1971).

The distinction between the two torts must be drawn because there are important differences in their required elements of proof. Both torts require proof of the publication and of the disparaging or defamatory nature of the statements involved. W. Prosser, *Law of Torts* § 128, at 920 (4th ed. 1971). In an action for product disparagement, however, a plaintiff must prove that the offending statements are false, *Swan v. Tappan*, 5 Cush. 104, 59 Mass. 104 (1850); *Marlin Firearms Co. v. Shields*, 171 N.Y. 384, 64 N.E. 163 (1902), whereas in an action for corporate defamation, falsity is presumed and truth is a defense which must be proven by the defendant. Restatement (Second) of Torts § 581A, Comment b (1977). In addition, if the action is for product disparagement, the plaintiff must allege and prove special damages—specific proof of pecuniary loss—before being entitled to recover. *Dooling v. Budget Publishing Co.*, 144 Mass. 258, 10 N.E. 809 (1887);

we can see how they might become quite disturbing when listening to soloists. Then the idea occurred to us to see what might happen when the Bose loudspeaker system reproduced monophonic records and lo and behold, the system imparted the same kind of vast spaciality to them as it did to stereo records producing the same kinds of physical size distortions noticed in the case of stereo records. Nevertheless, many listeners will find the overall effect produced by the Bose exciting, we think they may be willing to overlook the system's deficiencies to attain these effects. Audio purists, beware.

"Insofar as the sound quality of each unit (sic), the Harman-Kardon would have been placed in the lower group of medium accuracy loudspeakers. Its sound was distinctly hollow and muddy. The Bose produced relatively good sound quality and would rank somewhere between the high and medium accuracy group about on a par with the AR 3A. Its main fault was in the bass. The small individual loudspeakers that the Bose system uses are not by themselves capable of radiating extreme low frequencies, hence a need for the equalizer box, the electronic gadget that one plugs into the amplifier or receiver. Among other functions, this electronically provides the bass to compensate for the small loudspeaker weaknesses and in fact, it succeeds in doing a pretty remarkable job enabling the Bose to reproduce extremely

deep bass sound. But the combination of equalizer and loudspeaker tends to overemphasize the middle bass giving it a somewhat overly-full heavy sound in this register.
(Material pertaining to Harman-Kardon HK–50 loudspeakers omitted)
*Essential Facts*
"The Bose loudspeakers are irregularly shaped boxes having the overall dimension of $13 \times 20\frac{3}{4} \times 13$ in. and each weighing 34 lbs. The impedance of each loudspeaker was $9\frac{1}{2}$ ohms (minimum and nominal) and they required at the very least an amplifier power of 30 watts (for deepest bass 50 watts would be still better)." PX–10, p. 27–33.

16. Many other terms have also been used in referring to the tort of product disparagement. Among them are trade libel, slander of title, slander of goods, disparagement of title, disparagement of goods, unfair competition, interference with prospective advantage, and injurious falsehood. W. Prosser, *Injurious Falsehood: The Basis of Liability*, 59 Colum.L.Rev. 425 (1959).

17. The parties have agreed that the laws of the states of Massachusetts and New York are identical with respect to the elements of the tort of product disparagement, thus eliminating choice of law as an issue in this case.

1260

*Marlin Firearms Co. v. Shields*, 171 N.Y. 384, 64 N.E. 163 (1902). Until recently,[18] at least, damages were presumed in an action for corporate defamation. Restatement (Second) of Torts § 569 (1977).

It follows that because this is an action for product disparagement, the burden is on the plaintiff to prove that the statements made by CU were false and to prove the existence and amount of special damages. The Court severed the issue of damages from the other issues in this case, but not before the plaintiff made a minimal showing that it could produce evidence of special damages.

CU urges that, before dissecting each statement contained in the Bose Portion of the Article, the Court should read the entire Article. According to CU, the Article, when read as a whole, is not disparaging at all, but complimentary to the Bose 901. The Court does not accept this characterization. The Article contains some statements that might be interpreted as complimentary,[19] but the effect of that language is more than outweighed by other statements that are clearly critical[20] of the Bose 901. The Court concludes that the Article, when read as a whole, is disparaging.

The plaintiff claims that there are numerous factual errors in the Bose 901 Portion of the Article. In the following paragraphs each of the alleged factual errors will be discussed in turn, with regard to whether the statement is in fact false and with regard to whether the statement is disparaging.

## "Panels"

The words "panel" and "panelists" appear throughout the Article, especially in the Bose 901 Portion. The Article does not explain, however, that there were in fact three different panels involved in testing the loudspeakers—the "A–B listening test" involved a panel of five CU employees, the "cricket test" utilized a panel of two CU employees, and the "special listening test" involved only Seligson and Lefkow. The plaintiff claims that CU's use of the words "panel" and "panelists" without explaining that three different panels were involved was misleading. It was also misleading, according to the plaintiff, for CU to use the word "panel" when referring to only two people. Seligson himself testified that the use of the word "panel" to describe two persons could be "possibly a mite misleading." Tr. 9–89.

While the Court agrees that CU's use of the words "panel" and "panelists" was misleading to the readers of the Article, it is difficult to see what harm such misleading use of terms caused the plaintiff. The mis-

18. In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349, 94 S.Ct. 2997, 3011, 41 L.Ed.2d 789 (1973), the Supreme Court held in a personal defamation action that "the States may not permit recovery of presumed or punitive damages, at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth."

19. The plaintiff concedes that the following statements contained in the Article might be construed as complimentary to the Bose 901:

When it came to music, the panelists immediately noted a remarkable difference between the systems. The *Bose 901* seemed considerably more spacious and reverberant, actually to the point of giving the impression that the wall of the listening room had dropped away. The effect was rather dramatic and was felt from any listening position.

20. The complimentary effect created by the language quoted in note 19, *supra*, is clearly undercut by the following paragraph which is introduced by the word "But," and contains language that can hardly be considered complimentary:

But after listening to a number of recordings, it became apparent that the panelists could pinpoint the location of various instruments much more easily with a standard speaker system than with the *Bose* system. Worse, individual instruments heard through the *Bose* system seemed to grow to gigantic proportions and tended to wander about the room. For instance, a violin appeared to be 10 feet wide and a piano stretched from wall to wall. With orchestral music, such effects seemed inconsequential. But we think they might become annoying when listening to soloists. On an impulse, we also played some monophonic records through the *Bose*. To our surprise, they too acquired the same spacial openness and size distortions as the stereo records.

leading use of the words "panel" and "panelists" simply does not disparage the Bose 901.

### Equalizer Function

The Bose 901 Portion of the Article said the following with regard to the Bose 901 active equalizer:

> The electronic equalizer is intended to further compensate for the relatively low bass efficiency of small speakers, to compensate for the loss of treble when sound is reflected from the walls, and thus to help provide a uniform overall response. The active equalizer can be adjusted, within limits, to vary the sound to individual taste.

At trial the plaintiff contended that this statement was false. However, the plaintiff has represented that it no longer relies upon this asserted factual error as a basis for relief in this action [21] and the Court will disregard it.

### Sound Quality

The following statement was made in the Bose 901 Portion of the Article:

> As for sound quality, if the *Bose 901* had been rated with the main group of tested speakers, it would have fallen between the high- and medium-accuracy groups.

The main body of the Article states:

> Over the years, CU has constantly refined its testing methods and examined repeatedly the relationship between measurable factors and listeners' judgments on quality. From such studies, we arrived at two conclusions. First, loudspeaker quality, as the listener finds it, *can* be measured in the lab, but only roughly—to divide speakers into broad quality groups of the kind used in our Ratings.

The plaintiff reads the two foregoing statements as implying that the Bose 901 had been subjected to careful, objective tests and measurements which had resulted in its being ranked below the "High Accuracy" loudspeakers. According to the plaintiff, none of the tests that were performed on the loudspeakers to determine their accuracy were objective at all, and, even if they could be considered objective, they were not performed on the Bose 901. Thus, the plaintiff contends, CU misled its readers into thinking that the sound quality of the tested loudspeakers, including the Bose 901, had been carefully and objectively measured and that the sound quality of the Bose 901 had been found lacking in some respects. The facts giving rise to the plaintiff's claim are as follows.

The "accuracy" ratings were derived in part from the "objective tests" that were performed on the loudspeakers. A "roughness index," a "spectrum index," and a "low frequency index" [22] were determined for each of the conventional loudspeakers.[23] These three indices were then multiplied together to determine a score for each loudspeaker. After a score was determined for each loudspeaker, Seligson applied his own subjective judgment to alter the scores because he felt "the objective scores did not reflect the true standing." Tr. 10–127. The final rankings of the conventional loudspeakers which appeared in the Article reflect the scores as altered by Seligson.

The Bose 901 and the Harman-Kardon HK50 loudspeakers were never scored in this fashion because they were unconventional loudspeakers. The technique for evaluating the objective data generated by such unconventional loudspeakers was be-

**21.** Plaintiff's Requested Findings Of Fact And Conclusions Of Law, p. 197.

**22.** The terms "roughness index," "spectrum index," and "low frequency index" are not generally accepted terms within the field of loudspeaker testing. Rather, they are terms that were invented by Seligson and Lefkow in an ad hoc fashion to refer to the testing procedure they followed. Tr. 9–103.

**23.** At least for the purposes of this trial, a conventional loudspeaker was defined as a loudspeaker whose drivers are mounted on the front panel and radiate sound in a forward direction directly out into the listening room. Tr. 9–110.

yond CU's capabilities at the time. Therefore, none of the three indices was determined for the unconventional loudspeaker. Nevertheless, the Article made the following statements about the unconventional loudspeakers.

> As for sound quality, if the *Bose 901* had been rated with the main group of tested speakers, it would have fallen between the high- and medium-accuracy groups.

> Our judgment of the overall sound quality of the *Harman-Kardon HK50* would place it in the lower section of the medium-accuracy group. Its sound was distinctly hollow and muddy.

The Court agrees with the plaintiff that the Article implies that the accuracy of the tested loudspeakers was determined in an objective fashion. CU's statement that "[l]oudspeaker quality ... can be measured in the lab ...," creates the impression that such measurements made in a laboratory are objective ones, rather than the type of subjective judgments made by Seligson. The Court also agrees that the foregoing implication was false. The fact that objective scores were determined is of little consequence in view of the fact that Seligson subsequently altered those objective scores to conform to his subjective judgments. In addition to the fact that the tests that were performed on the conventional loudspeakers lacked objectivity, no objective scores at all were determined for the Bose 901 or for the HK50 loudspeaker.

■ Standing by itself, however, the false implication that the accuracy of the tested loudspeakers was determined in an objective manner does not entitle the plaintiff to relief, because it is not disparaging. The statement that the plaintiff really disputes is CU's rating of the Bose 901 as "between the high- and medium-accuracy groups." The allegedly harmful effect of that statement could, of course, be exacerbated by the false implication that the accuracy of the loudspeakers was determined in an objective manner. Nevertheless, the false implication that the accuracy of the tested loudspeakers was determined in an

objective manner, taken alone, does not reflect adversely on the Bose 901 and is thus not disparaging.

The plaintiff also argues that because no objective score was determined for the Bose 901, it was impossible for CU to have rated the Bose 901 "with the main group of tested speakers." Thus, CU's statement that "if the *Bose 901* had been rated with the main group of tested speakers, it would have fallen between the high- and medium-accuracy groups" must have been false. The plaintiff's argument, however, presumes that the only way in which a loudspeaker could be rated "with the main group of tested speakers" would be if an objective score had first been determined for that loudspeaker. In reality, however, the objective scores obtained in the tests were irrelevant for purposes of the ratings because the objective scores were subsequently adjusted by Seligson to conform to his subjective assessments. Seligson's adjustments caused the entire rating process to be subjective. Therefore, no objective score was needed in order to rate the loudspeakers and CU's failure to perform objective tests on the Bose 901 would not preclude CU's rating of the Bose 901 "with the main group of tested speakers."

■ With regard to the "sound quality" or "accuracy" of the Bose 901, the crux of the dispute between the parties is CU's rating of the Bose 901 as "between the high- and medium-accuracy groups." The plaintiff contends that the Bose 901 should have been rated in the high accuracy group. The problem with the plaintiff's position is that all the experts who testified in the case, including Dr. Bose, agreed that the evaluation of any loudspeaker's "sound quality" or "accuracy" is a subjective matter. In the final analysis it is nothing more than an opinion and, as such, it cannot be proved to be true or false. As the Supreme Court said in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339, 94 S.Ct. 2997, 3006, 41 L.Ed.2d 789 (1974), "Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not

on the conscience of judges and juries but on the competition of other ideas."

### Power Requirements

CU rated the tested loudspeakers in the Article with regard to a number of characteristics, including amplifier power.[24] In its amplifier power ratings CU stated a figure in watts for each of the rated loudspeakers, ranging from a high of 27 watts for the Dynaco A25 to a low of four watts for the Yamaha NS15, explaining that:

> The power figure (in watts) is the minimum average sine-wave amplifier power found to be required to produce a loud sound in a listening room of about 3000 cu. ft. with "average" acoustics;

Seligson testified that the "loud sound" referred to in the Article was approximately 85dB[25] on average, with momentary peaks as high as 93–94dB. Tr. 11–27.

The Dynaco A25 was the only loudspeaker rated by CU in the Article as requiring more than 15 watts of amplifier power. Thirteen of the nineteen rated loudspeakers were described as requiring less than 10 watts of amplifier power. PX–7, pp. 277–278. The Article also stated that the power requirement of a loudspeaker was "an important factor" to be considered in choosing a loudspeaker. PX–7, p. 273, column 2.

With respect to the power requirements of the Bose 901, the Article stated:

> If you do consider buying the system, note well this fact: The *Bose* requires a rather gigantic amount of power. CU recommends you have an amplifier of 50 watts per channel for the deepest bass response.[26]

The parties seem to agree that the average reader would read the above-quoted statement in the context of the entire Article and would therefore infer that the recommended 50 watts of amplifier power was necessary for the Bose 901 to produce the deepest bass sounds at *"loud"* volume levels. PRFOF p. 113, DRFOF pp. 25–26 (Emphasis added). The plaintiff argues that the readers of the Article would interpret CU's statement as meaning "that the Bose 901 required more amplifier power than any of the other speakers tested by CU, and that a user would require an amplifier having a power of 50 watts per channel to produce the deepest bass sounds from the Bose 901 at loud levels, whereas the other loudspeakers tested would require only a small fraction of that power." PRFOF p. 113 (Citations omitted). According to the plaintiff, CU's statement, so interpreted, is false because the Bose 901 does not require more power than the other rated loudspeakers to produce the deepest bass sounds at loud volume levels. The plaintiff also contends that the statement is disparaging because at the time of the Article's publication very few consumers had amplifiers of 50 watts per channel or more. Therefore, in the plaintiff's view, for the majority of consumers at that time, the Article's recommendation was tantamount to advice not to buy the Bose 901.

The Court has carefully considered all the evidence introduced by the parties on the issue of the power requirements of the Bose 901. The record with respect to this issue is replete with irreconcilably contradictory statements and evidence of questionable trustworthiness. It is difficult to understand why the record should be so muddled with respect to an issue such as the power requirements of the Bose 901, which both parties concede can be easily

---

**24.** Although the Bose 901 was tested in almost the same manner as the other tested loudspeakers, it was not rated along with the other loudspeakers because it was not in the medium price range. PX–2, p. 272, 277–78; Tr. 6–159, 160.

**25.** The loudness of sound is usually measured in units known as "decibels," which correspond to varying sound pressure levels on a logarithmic scale. The number of decibels increases as loudness increases. The scientific notation for decibels is "dB." Tr. 2–43; PX–1, p. 10.

**26.** The above quoted words contained in the Article were based on the following words contained in Seligson's draft Report to Editorial (PX–10, p. 33): "The impedance of each loudspeaker was 9½ ohms (minimum and nominal) and they required at the very least an amplifier power of 30 watts (for deepest bass 50 watts would be still better)."

measured with the use of an oscilloscope. All that was necessary was a measurement of the power required by the Bose 901 under the same conditions as those used by CU in its original tests, yet neither party performed such a measurement.[27] On the basis of the present record the matter is still entirely within the realm of speculation. Accordingly, the Court rules that the plaintiff has not sustained its burden of proving by a preponderance of the evidence that the defendant's statements—"If you do consider buying the system, note well this fact: The Bose requires a rather gigantic amount of power. CU recommends you have an amplifier of 50 watts per channel for the deepest bass response."—were false.

### Size and Movement

The bulk of the testimony at trial concerned the following statements which were made in the Bose 901 Portion of the Article:

But after listening to a number of recordings, it became apparent that the panelists could pinpoint the location of various instruments much more easily with a standard speaker system than with the Bose system. Worse, individual instruments heard through the Bose system seemed to grow to gigantic proportions and tended to wander about the room. For instance, a violin appeared to be 10 feet wide and a piano stretched from wall to wall. With orchestral music, such effects seemed inconsequential. But we think they might become annoying when listening to soloists. On an impulse, we also played some monophonic records through the Bose. To our surprise, they too acquired the same spacial openness and size distortions as the stereo records.[28]

Before discussing the size and movement of "individual instruments" it is necessary to define some terms which will be used in the following sections of this opinion. One characteristic of stereo loudspeaker systems is that when a listener is situated in the "ideal listening position," equidistant from two loudspeakers, and the same sound emanates from the two loudspeakers simultaneously, the listener perceives the source of the sound not as either or both of the two actual loudspeakers but as a "phantom" or "apparent" source located somewhere between the two loudspeakers. There was a great deal of confusion in the terminology used at trial [29] because there are no consistent, widely accepted terms used to describe

---

27. CU attempted such a measurement but failed to use the same type of recordings that it used in its original tests of the Bose 901.

28. The above quoted language was based on the following statements in Seligson's draft Report to Editorial (PX–10):

"After listening to a number of recordings this way, it became apparent that precise localization of musical instruments (as opposed to the sharp noised cricket of experiment 1 [the cricket test]) appeared to be inferior to that of the standard loudspeaker system even when the listener was seated in the ideal listening position for good stereo, but that the overall heightening of the acoustic ambiance held up well in just about any listening position. Continued listening revealed a number of other disturbing aspects to the Bose system. Instruments not only could not be placed with precision but appeared to suffer from giganticism and a tendency to wander around the room; a violin seemed about 10 ft. wide, a piano stretched from wall to wall, etc. These effects were entirely innocuous when listening to orchestral music but we can see how they might become quite disturbing when listening to soloists. Then the idea occurred to us to see what might happen when the Bose loudspeaker system reproduced monophonic records and lo and behold, the system imparted the same kind of vast spaciality to them as it did to stereo records producing the same kinds of physical size distortions noticed in the case of stereo records."

29. The following terms all seem to have been used by various persons at various times during the trial to refer to the same phenomenon: apparent source, sonic image, effective source, sound image, phantom source, acoustic image, auditory image, auditory source, image, source, apparent sound image, and apparent sound source. The confusion was compounded when the questioners and witnesses spoke about the size or location of the "apparent sound source." For example, references to size included the following terms: size of the sound, spacial dimension of the sound, apparent size of the source, and size of the image.

this phenomenon.[30] In this opinion the Court will use the words "apparent sound source" to describe the area located somewhere between two loudspeakers which the listener perceives to be the source of the sound arriving at his ears. Except when quoting the Article the Court will use the word "instrument" to refer to the musical instrument that originally produced music that is later reproduced by a stereo system.

### Size

The testimony at trial concerning the statement about "instruments" which "seemed to grow to gigantic proportions" was confusing at times because the parties approached the issue from different viewpoints. The plaintiff reasoned that the average reader would interpret the above-quoted statement as meaning that the "panelists" actually perceived that the physical dimensions of the musical instruments whose sound was being reproduced had grown. Therefore, in an attempt to establish the falsity and disparaging nature of the statement, the plaintiff produced evidence that tended to show that a person listening to the Bose 901 could not possibly perceive that the physical dimensions of a musical instrument heard through the Bose 901 had grown. The defendant, on the other hand, concluded that the statement would be interpreted by the reader to mean that the apparent sound source of a particular instrument whose sound was being reproduced on the Bose 901 had become gigantic. Accordingly, in order to prove the truth of its statement, the defendant introduced evidence tending to show that it is indeed possible for a listener to perceive that the apparent sound source of an instrument played through the Bose 901 had become quite large.

Because of the different approaches taken by the parties on this issue, the actual meaning of the words used becomes critical. Since this is a non-jury case it is the Court's obligation to determine not only whether the above-quoted statement is susceptible of the meanings suggested by the parties, but also how the statement was in fact reasonably interpreted by readers of the Article. In making these determinations the Court must construe the words used in their natural sense, as persons generally understand them. *Cafferty v. Southern Tier Publishing Co.*, 226 N.Y. 87, 93, 123 N.E. 76, 78 (1919); *Lyman v. New England Newspaper Publishing Co.*, 286 Mass. 258, 260, 190 N.E. 542, 543 (1934).

There is no evidence in the case that suggests that the words used would have any unusual meaning to any particular group, such as audiophiles,[31] who might have more interest in the Article than the general public.

The Court finds that the words used— "Worse, individual instruments heard through the *Bose* system seemed to grow to gigantic proportions and tended to wander about the room. For instance, a violin appeared to be 10 feet wide and a piano stretched from wall to wall."—are susceptible of both of the interpretations suggested by the parties. The words could mean that the panelists perceived that the physical dimensions of the instruments themselves had grown; they could also mean that the panelists perceived that the apparent sound source had grown. The Court further finds, however, that the interpretation suggested by the plaintiff—that the panelists perceived that the physical dimensions of the instruments themselves had grown—is not a reasonable one and that the readers of the Article did not so interpret the above-quoted statement.

In making the foregoing determination the Court relies not only on its own reading of the words of the Article, but also on the testimony of Dr. Bose, which the plaintiff offered at trial to show the falsity of the statements in the Article. Dr. Bose testified at length about the phenomenon of instruments growing to gigantic proportions and concluded that no one, when lis-

---

**30.** Tr. 18–121.

**31.** Dr. Bose testified that an "audiophile" is a person "who specializes in audio equipment in his home." Tr. 4–28.

tening to a stereo loudspeaker system, could possibly conclude that the instruments that originally generated the sound that was being reproduced by the loudspeakers had grown to gigantic proportions. Common sense supports Dr. Bose's conclusion. To the Court's knowledge, no one has ever heard a 10-foot violin or a wall-to-wall piano being played, and it would be difficult for a listener to imagine the sound produced by something totally foreign to his experience. It would be impossible to conclude that a reader would interpret the words of the Article in such an absurd manner.

The Court thus concludes that the statement in the Article about "instruments" which "seemed to grow to gigantic proportions" was interpreted by the readers of the Article to mean that the apparent sound source had become gigantic. The next question for determination is whether the statement is false even with that meaning impressed upon it.

The defendant's witnesses testified that one peculiar characteristic of the Bose 901 is that orchestral music played through the system has a diffuse quality—it seems to be coming from the entire wall behind the loudspeakers rather than from a discrete area along the wall or from the loudspeakers themselves.[32] According to Seligson and Lefkow, however, a different effect is produced when a recording of a solo instrument is played on the Bose 901. Seligson and Lefkow agreed that what they observed during the "special listening test" was that individual notes produced by an instrument seemed to emanate from various points along the wall of the listening room, the location of those points varying with the frequency of the note being played. Seligson described his observations by using an analogy to the sense of sight:

> As best as I could describe it, it would be that—if you can imagine peering at an array of lights from a distance so when you view them they seem like a blur of lights somewhere in front of you; and in this array of lights there may be individual lights which twinkle more strongly and

focus one's attention upon them, but the twinkling shifts from point to point so that one's attention is drawn first to one spot, then to another, but it would be difficult to see whether at those times when one's attention shifts to a bright spot, whether one has suppressed the fact that there is a broad light source behind.

> This is something that occurs with time and it is a perception. It is difficult to recall precisely the manner in which I heard it, but that is about the best analogy that I could give you. Tr. 10–21. With the violin wide, the impression is one predominantly of sound coming at you from roughly the entire area in front of you.

> In other words, roughly from in front of the entire area. But individual notes, however, may occasionally seem to focus a little better in one location than in another and give the impression that that is where the violin is for that moment.

> And it is a shifting impression. Tr. 10–19.

Lefkow described his observations as follows:

> Yes, the piano seemed very wide in the sense that you could hear the various tones from the piano come in at many points right across the front of the room. And the violin, as the violin is played, the violin—the source of the notes seemed to change as he played different notes. As he went up and down the scale, I heard the notes coming from different points, spread out between the two speakers. Tr. 12–157.

The defendant's expert, Dr. Green, testified that:

> I have heard things [through the Bose 901] that I would describe as, first of all, as very broad image. There is no question about that. Secondly, the source is hard to localize. It's vague, and from moment to moment changes its location. So you might, especially on solo instruments, the apparent source moves from time to time. It could be located in any

32. Tr. 7–103, 12–155, 14–110.

number of places in front of you. Tr. 14–110.

As noted above, *supra* at p. 20, the plaintiff concentrated its efforts on proving that a person listening to music being played over the Bose 901 could not possibly perceive that the physical dimensions of the musical instruments which originally produced the music had grown in size. Therefore, the plaintiff did not present any evidence to contradict the defendant's evidence which tended to show that when listening to the Bose 901 a listener could and does perceive that the apparent sound source is very large. Thus, the Court concludes that the plaintiff has not sustained its burden of proof by a preponderance of the evidence that the defendant's statement —"instruments . . . seemed to grow to gigantic proportions"—was false.

### Movement

The Article states that CU's panel, Seligson and Lefkow in this instance, heard individual instruments that "tended to wander *about* the room" (Emphasis added). At trial, however, both Seligson and Lefkow testified that the wandering sounds that they heard were confined to an area within a few feet of the wall near which the Bose 901 loudspeakers were placed.[33] While conceding that the phrase "about the room" "may not be a literally accurate modifier of the verb 'wander'," the defendant argues that the consumer would only be interested in the phenomenon of wandering instruments, not in the locations to which they

wandered. Thus, according to the defendant, its statement was "substantially accurate" because it accurately reported the critical observation—instruments that tended to wander.

The Court does not accept the defendant's characterization of its statement as being "substantially accurate" because, contrary to the defendant's assertion, the evidence indicates that the location of the alleged wandering would indeed be important to consumers. The testimony at trial showed that a certain degree of movement of the location of the apparent sound source is to be expected with all stereo loudspeaker systems. Such movement is a natural consequence of the stereo recording process and is due to the various polar radiation patterns [34] produced by an instrument at various frequencies. Because such movement between two loudspeakers is a common effect and is to be expected, a reader would not be surprised to read about "instruments" moving along the wall between two loudspeakers. Movement throughout the other areas of the room, however, is not to be expected. Such a bizarre effect is contrary to what the average listener has become accustomed and would probably be found objectionable by most listeners. The Court concludes, then, that the location of the movement of the apparent sound source is just as critical to a reader as the fact that movement occurred, and that the defendant's statement is not substantially accurate simply because it reported accurately that "instruments . . . tended to wander . . .".

**33.** In order to rebut the charge made by Dr. Bose that it is scientifically impossible for anyone to perceive instruments that "tended to wander about the room," the defendant presented the testimony of its expert, Dr. Green, who testified at length concerning a person's ability to perceive that the apparent sound source of a particular sound had moved away from the wall out into a room. However, because both members of CU's panel, Seligson and Lefkow, testified that the wandering sounds were confined along the wall, Dr. Green's testimony concerning a person's ability to perceive that an apparent sound source had moved out into the room is, strictly speaking, irrelevant.

The defendant also places reliance on the testimony of its technical director, Monte Flor-

man, who claims to have heard certain unusual auditory effects when listening to the Bose 901. After appraising Florman's demeanor and the substance of his testimony, however, the Court finds that Florman's testimony is wholly untrustworthy and is not credible. Consequently, to the extent that Florman's testimony differs from that of Seligson and Lefkow, it has been disregarded.

**34.** A musical instrument radiates a single frequency at different intensities depending upon the direction. A graphical representation of the intensity versus direction yields what is known as a polar radiation pattern for that single frequency. Tr. 2–65, 66, 19–83, 84.

The defendant claims that its statement about wandering "instruments" must be read as modified by the following sentence, which reads: "For instance, a violin appeared to be 10 feet wide and a piano stretched from wall to wall." According to the defendant this sentence localized the wandering "instruments" along the wall between the two loudspeakers. The Court concludes that no reasonable reader would read these sentences as CU urges. The second sentence gives examples which could only be read by a reader as referring to the size of the "instruments," not to their location.

The Court also finds that the average reader would interpret the word "about" in its plain ordinary meaning. Florman agreed that the word "about" in this context means the same thing as "around". Tr. 12–117, 118. In fact, Seligson's initial draft contained the words "around the room," rather than "about the room." PX–10, at p. 29.

The absence of similar observations by other listeners, both untrained and professional, tends to support the conclusion that Seligson and Lefkow did not hear "instruments" that "tended to wander about the room." If the Bose 901 actually produced such unusual auditory effects it would be natural to assume that Bose 901 owners would complain to Bose about them. Yet Dr. Bose testified that to his knowledge no Bose 901 purchaser had ever complained to Bose about the Bose 901 causing "instruments" to appear to wander about the room. In addition, none of the reviews of the Bose 901 that were reprinted by Bose (DX–A) contain a statement that could be construed as referring to wandering "instruments." On the contrary, one of the reviews (DX–A p. 13), published in *Stereo & HiFi Times*, contains the following state-

ment, which seems to directly contradict CU's comment about "instruments" that "tended to wander about the room":

> A multi-directional speaker seems to have its sound escape from its box. The source of the sound becomes an area of space above and behind the actual enclosure. This is created beautifully by these speakers. A stereo pair fills the wall with stereo, *yet each instrument has its prescribed space—and it stays there.* You can spread these speakers much wider apart than conventional boxes without creating a "hole-in-the-middle" effect. DX–A, p. 13 (Emphasis added).

■ Based on the foregoing analysis, the Court finds that the statement in the May 1970 Article that "individual instruments heard through the *Bose* system . . . tended to wander about the room" is false. The Court also finds that the statement is disparaging. A statement that attributes such grotesque qualities as instruments wandering about the room to the plaintiff's product could have no effect other than to harm the reputation of the product.[35] That such a harmful effect was intended is demonstrated by the use of the word "worse" to introduce the sentence. Use of the word "worse" obviously indicates that what preceded was a deficiency but what followed would be an even greater deficiency in the product.

Dr. Bose, who attempted to combat the perceived negative effects of the Article by visiting and talking with his dealers, testified that with respect to the comments contained in the Article the most frequent complaints that he heard from dealers and consumers concerned "The enlarged and wandering instruments and the statement about gigantic power required." Tr. 2–144.

---

**35.** The defendant claims that the following limitation contained in the Article somehow mollifies the harmful effect of its false statement:

> With orchestral music, such effects seemed inconsequential. But we think they might become annoying when listening to soloists.

The defendant, however, offered no evidence to prove that a significant number of persons limit their musical tastes to orchestral music. Even in orchestral music there are often solo passages. Therefore, the Court does not agree that the above-quoted statement in any way cushions the blow of the earlier statement that instruments "tended to wander about the room." In fact, the subsequent statement enhances the disparaging effect of the earlier one because it characterizes the effects heard as possibly becoming "annoying."

Thus, the false statement that "individual instruments heard through the *Bose* system . . . tended to wander about the room" cannot ·be considered a *de minimis* violation of the plaintiff's rights.

In summary, the Court has ruled that with respect to one statement made in the Article—"individual instruments heard through the *Bose* system . . . tended to wander about the room"—the plaintiff has sustained its burden of proving by a preponderance of the evidence that the statement was both false and disparaging. With respect to each of the other statements contained in the Article the Court has ruled that the plaintiff has failed to sustain that burden in some respect.

Because the Court has ruled that at least one statement contained in the Article was both false and disparaging, the remaining question for determination is whether the defendant observed the required standard of care in making that statement. Before making that determination, however, the Court must first assess the impact of the Supreme Court's First Amendment decisions on the standard of care required of the defendant.

### First Amendment Issues

In *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court first announced the federal rule under the First Amendment "that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279–80, 84 S.Ct. at 725–726. Under the *New York Times* rule, actual malice must be shown with "convincing clarity" rather than by a mere preponderance of the evidence.[36] *Id.* at 285–86, 84 S.Ct. at 728–729.

The Court extended the scope of the *New York Times* privilege in *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), by holding that the constitutional privilege applies to defamatory statements about public figures as well as about public officials. The *New York Times* privilege was then given its most expansive reading in *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), where a three-member plurality of the Court held that the privilege could also be asserted against a private individual involved "in an event of public or general concern." *Id.* at 52, 91 S.Ct. at 1824. Under *Rosenbloom* the focus was no longer on the status of the plaintiff, but on the newsworthiness of the events involved.

In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the Court rejected the *Rosenbloom* "public interest" test and reverted to a status based test. The Court held that "so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." *Id.* 418 U.S. at 347, 94 S.Ct. at 3010 (Citation omitted). Thus, under *Gertz*, a plaintiff who is neither a public official nor a public figure is no longer required to prove that a defamatory statement was made with "actual malice."

Predictably, the defendant asserts the *New York Times* constitutional privilege as a defense to this action. The facts of the present case, however, raise some issues under the *New York Times* standard which are at present unsettled. For example, the two following questions must be confronted.

1) Does the *New York Times* actual malice standard apply to product disparagement cases as well as to personal defamation actions?

2) Can a corporation become a public figure and, if so, how?

---

**36.** The Court subsequently made clear that "convincing clarity" is identical with "clear and convincing proof." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789 (1973). Under *New York Times* only actual malice must be demonstrated with clear and convincing proof. The plaintiff must satisfy the traditional preponderance of the evidence standard with respect to the other issues in the case.

The Court's resolution of the foregoing questions will determine whether the actual malice standard applies in this case. The Court must then determine whether the plaintiff has sustained its burden of proof under the applicable standard.

### Does the actual malice standard apply to product disparagement cases?

All the Supreme Court cases to date which have applied the *New York Times* standard have been personal defamation actions rather than product disparagement cases or cases involving defamation of a corporation. Lower court decisions, however, seem to suggest that the actual malice standard should not be limited to personal defamation actions.

A case in point is *Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264 (3d Cir. 1980). In *Steaks Unlimited* a television station broadcast a report by its consumer affairs editor which deprecated the quality of the meat being sold by an out-of-state corporation at several local department stores. Because the report was also critical of the corporation's business practices, the corporation brought suit for defamation rather than product disparagement. The court held that, because the corporation was a public figure under *Gertz*, the actual malice standard was applicable.

In *F & J Enterprises, Inc. v. Columbia Broadcasting Systems, Inc.*, 373 F.Supp. 292 (N.D.Ohio 1974), the court reached a similar result, although it should be noted that the court was applying the *Rosenbloom* "public interest" standard. In *F & J Enterprises* the plaintiff claimed that the defendants broadcast and published disparaging statements about the plaintiff's product, "Krazy Straw." Once again, as in *Steaks Unlimited, supra*, the case seems to have been treated as a corporate defamation case rather than a product disparagement action. The court, after determining that the statement concerned a matter of public interest, held that the actual malice standard applied.

Neither *Steaks Unlimited* nor *F & J Enterprises* specifically addressed whether the actual malice standard applies in cases of product disparagement because both cases were treated as corporate defamation actions. Nevertheless, by applying the actual malice standard in cases involving corporate defamation, *Steaks Unlimited* and *F & J Enterprises* suggest that the actual malice standard is not limited to personal defamation actions.

An analysis of the Supreme Court's reasoning in *New York Times* also leads to the conclusion that the actual malice standard should not be limited to personal defamation actions. In the *New York Times* line of cases the Supreme Court has attempted to strike a balance between the need for a vigorous and uninhibited press and the legitimate state interest in compensating individuals for wrongful injury to reputation.

The nature of the balancing process changes significantly in product disparagement cases because different interests are being weighed. In a personal defamation action one of the competing interests being balanced is an individual's interest in the protection of his reputation, which, according to Mr. Justice Stewart "reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty." *Rosenblatt v. Baer*, 383 U.S. 75, 92, 86 S.Ct. 669, 679, 15 L.Ed.2d 597 (1966) (concurring opinion). On the other hand, in this product disparagement action we are concerned with a manufacturer's interest in the reputation of its product, an interest not nearly as significant as an individual's interest in his personal reputation and hardly "at the root of any decent system of ordered liberty." Damage to a product's reputation, unlike damage to the reputation of an individual, can always be measured in terms of monetary loss. Moreover, a manufacturer almost always has access to the channels of communication that can be used to refute disparaging comments about its product.

On the other side of the scale in this balancing process is the consumer's interest in obtaining information about the quality and characteristics of consumer products.

The public's interest in obtaining information of this type is perhaps even greater than the corresponding interest in personal defamation actions, the interest in obtaining information about other people. Information obtained from product commentators often relates to health or safety problems in consumer products. *See, e. g., United Medical Laboratories, Inc. v. Columbia Broadcasting System, Inc.*, 404 F.2d 706 (9th Cir. 1968), *cert. denied*, 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969); *F & J Enterprises, Inc. v. Columbia Broadcasting Systems, Inc.*, 373 F.Supp. 292 (N.D.Ohio 1974). It would be unfortunate indeed if the threat of product disparagement actions stifled the free flow of such information.

■ On balance, the Court concludes that the factors underlying the *New York Times* privilege militate perhaps even more strongly in favor of the application of the actual malice standard in product disparagement cases than they do in personal defamation actions. Accordingly, the Court rules that the *New York Times* actual malice standard is applicable in this product disparagement case, provided, of course, that the plaintiff is a public figure for First Amendment purposes.

### Can a corporation become a public figure and, if so, how?

Under *Gertz* only a plaintiff who is a public official or public figure is required to prove that disparaging statements were made with actual malice. The difficulty in this case is that the plaintiff is a corporation and because the Supreme Court cases in this area have dealt only with personal defamation, no standards have been developed by the Supreme Court for use in determining whether a corporation is a public figure.

In the personal defamation area *Gertz* identified several categories of public figures:

Hypothetically, it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare. For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment. 418 U.S. at 345, 94 S.Ct. at 3009.

In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy, and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions. 418 U.S. at 351, 94 S.Ct. at 3012.

This case involves the category specified in *Gertz* which is composed of plaintiffs who "have thrust themselves to the forefront of particular public controversies," 418 U.S. at 345, 94 S.Ct. at 3009, and have thereby become public figures for a limited range of issues.

Various courts have struggled with the application of *Gertz* and other relevant Supreme Court cases in determining whether a corporation is a public figure for First Amendment purposes, but their conclusions have not been uniform.[37] Of the cases that

**37.** *Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d 583 (1st Cir. 1980) (Plaintiff corporation not a public figure under *Gertz* based on record presented to court); *Vegod Corp. v. American Broadcasting Companies, Inc.*, 25 Cal.3d 763, 603 P.2d 14, 160 Cal.Rptr. 97 (1979) (Plaintiff corporation not a public figure under

*Gertz*—"Criticism of commercial conduct does not deserve the special protection of the actual malice test." 25 Cal.3d at 770, 603 P.2d at 18, 160 Cal.Rptr. at 101); *Martin Marietta Corp. v. Evening Star Newspaper Co.*, 417 F.Supp. 947 (D.D.C.1976) (All corporations are public figures under *Gertz*, but are required, under *Ro-*

have considered the issue thus far, *Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d 583 (1st Cir. 1980), sets out perhaps the most reasoned and coherent analysis of the corporate public figure issue.

In *Bruno & Stillman* the plaintiff corporation, a manufacturer of commercial fishing boats, brought suit against the defendant newspaper company, alleging that the defendant published a series of libelous newspaper articles about the plaintiff. The defendant moved to dismiss, contending that the plaintiff, as a public figure, was required to comply with the stringent requirements of *New York Times*. The district court ruled that "corporations should be treated as public figures" and accordingly granted the defendant's motion to dismiss the Count of the Complaint which was based on mere negligence. *Bruno & Stillman, supra*, 633 F.2d at 585. The plaintiff's appeal followed.

The first step in the Court of Appeals' analysis was to identify which of the classes of public figures that were delineated in *Gertz* was relevant for the purposes of the case before it. In *Bruno & Stillman*, as in this case, the relevant class was constituted of persons who "have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved," *Gertz, supra*, 418 U.S. at 345, 94 S.Ct. at 3009, and therefore are public figures for a limited range of issues.

The Court of Appeals next reviewed the applicable Supreme Court cases and concluded that "the detailed, fact-sensitive nature of the precedent indicates that particularized determinations of public figure status are the rule." *Bruno & Stillman, supra*, 633 F.2d at 589. Therefore, the court rejected the district court's conclusion that all corporations are public figures, stating that "We recognize the attraction of broad and clearcut definitions in terms of simplifying litigation, but we cannot see how corporations as a class can be said to be 'public

figures' for First Amendment purposes." *Id.* at 589.

The court then proceeded to utilize the following two-step analysis in its particularized examination of the facts of the case. First, the court determined whether a public controversy existed, and, if so, whether it preceded the alleged defamation. The facts in *Bruno & Stillman* disclosed no public controversy antedating the allegedly defamatory articles. Second, the court followed the recommendation in *Gertz* that "It is preferable to reduce the public-figure question to a more meaningful context by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation." *Gertz, supra*, 418 U.S. at 352, 94 S.Ct. at 3013. The court therefore examined the facts of the case relating to the "nature and extent" of the plaintiff's activity in the controversy in question. On the basis of the record before it the court concluded that there was insufficient evidence that the plaintiff had thrust itself into the vortex of a public controversy and thus rendered itself a public figure. Consequently, the court held that the motion to dismiss was improperly granted and remanded the case for further development of the record with respect to the public figure issue.

■ The Court has already determined, *supra*, p. 32, that the present action is a "thrusting into the vortex" case, *Bruno & Stillman, supra*, 633 F.2d at 591, and thus merits the particularized approach outlined in *Bruno & Stillman*. The first question for determination, then, under *Bruno & Stillman*, is whether a public controversy preceded the publication of the allegedly disparaging comments about the Bose 901. The Court finds the relevant facts to be as follows.

The design of the Bose 901 was a radical departure from the design of conventional

senbloom, to prove actual malice only if publication concerned matter of public interest); *Trans World Accounts, Inc. v. Associated Press*, 425 F.Supp. 814 (N.D.Cal.1977) (Plaintiff corporation was public figure under *Gertz* for

limited range of issues); *Reliance Insurance Co. v. Barron's*, 442 F.Supp. 1341 (S.D.N.Y. 1977) (Plaintiff corporation was public figure under *Gertz* for limited range of issues).

loudspeakers. With its emergence on the market in 1968 the Bose 901 introduced several new and unique design concepts, including the use of an active equalizer, the use of both direct and reflected sound, and the use of nine identical drivers. A great deal of publicity attended the introduction of the Bose 901. As part of its promotional efforts, Bose published advertisements that stressed the principles of operation of the Bose 901, its unconventionality, the research underlying it, its unique appearance, and its quality. Bose not only advertised extensively in national publications to promote the Bose 901, but also actively solicited reviews of the Bose 901 by responsible reviewers so that its unique qualities would be brought to the attention of consumers. By May 1970 Bose had succeeded in having reviews of the Bose 901 published in several magazines and had spent over $100,000 in 1969 alone to advertise the Bose 901.[38]

By creating a new design for the Bose 901 and then emphasizing that unique design in its extensive promotional campaign, the plaintiff precipitated discussion about the relative merits of the Bose 901 and other loudspeaker systems. Because other loudspeaker manufacturers and reviewers for nationally published magazines were involved, the "controversy" was necessarily public rather than private. Thus, this case presents a situation where "persons actually were discussing some specific question"— the relative merits of the Bose 901 and conventional loudspeaker systems—and "a reasonable person would have expected persons beyond the immediate participants in the dispute to feel the impact of its resolution." *Waldbaum v. Fairchild Publications, Inc.,* 627 F.2d 1287, 1297, *cert. denied,* —— U.S. ——, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980) (footnote omitted). It is not a case where the defendant attempted to "create [its] own defense by making the claimant a public figure." *Hutchinson v. Proxmire,*

443 U.S. 111, 135, 99 S.Ct. 2675, 2688, 61 L.Ed.2d 411 (1979). The defendant, by its publication of the Article, did not create the public controversy. It simply added its voice to the chorus that was already discussing the merits of various loudspeaker systems. Thus, in the present case there was a "public controversy" that preceded the publication of the allegedly disparaging remarks.

The second part of the *Bruno & Stillman* analysis is to determine "the nature and extent of [the plaintiff's] participation in the particular controversy giving rise to the defamation." *Gertz, supra,* 418 U.S. at 352, 94 S.Ct. at 3013. In this case the plaintiff's participation in the "controversy" over the relative merits of the Bose 901 and conventional loudspeakers was extensive. The plaintiff actually precipitated the controversy by using a market strategy that emphasized the unconventional design of the Bose 901. Unlike the record in *Bruno & Stillman,* which was silent with regard to the scale and nature of the plaintiff's promotional efforts, the record in this case fully discloses the types of promotional efforts used by the plaintiff and the degree to which they were employed. The extent of the plaintiff's advertising alone might very well justify a holding that the plaintiff is a public figure. *Steaks Unlimited, Inc. v. Deaner,* 623 F.2d 264, 274 (3d Cir. 1980) (advertising blitz). In addition to its extensive advertising of the Bose 901, however, the plaintiff also actively sought to have reviewers test and review the Bose 901, and then incorporated such written reviews in its advertising brochures. These actions by the plaintiff clearly "invited public attention, comment, and criticism." *Steaks Unlimited, supra,* 623 F.2d at 274.

*Gertz* suggests that at least two factors in addition to those discussed in *Bruno & Stillman* are to be considered in determining whether a plaintiff is a public figure.

---

**38.** Bose spent approximately $100,000 to advertise and promote the Bose 901 during the fiscal year ending June 30, 1969. During the next year, ending June 30, 1970, Bose spent at least $200,000 on advertising and promotion. In the fiscal year ending June 30, 1971, Bose spent at least $300,000 on advertising and promotion. Stip. A, DSOUF 27.

First, the Court noted in *Gertz* that public officials and public figures usually enjoy greater access to the media than private individuals and can thereby counteract the effects of false statements.[39] Second, the Court pointed out that public officials and public figures have voluntarily assumed the increased risk of defamatory falsehood that accompanies their notoriety, at least to the extent that their own conduct has precipitated that notoriety.[40]

Both factors militate in favor of holding Bose to be a public figure in this case. Bose unquestionably had access to the media to rebut the false statements published in the *Consumer Reports* Article. In fact, in February 1971, a few days prior to the filing of the complaint in this case, Dr. Bose and Frank Ferguson,[41] the president of Bose Corporation at that time, personally delivered copies of the unfiled complaint to the United Press International, the *New York Times, Business Week,* and the *Boston Herald Traveler.* Each of those organizations subsequently published an article detailing Bose's charges against CU. In addition, Bose continued to have access to the media to extensively advertise its product.

It is also clear that Bose voluntarily assumed the increased risk of injury from defamatory falsehood. Bose not only extensively advertised the Bose 901, but also actively sought to have its product reviewed by product commentators. Bose then used reprints of the published reviews as part of its advertising campaign. By soliciting such reviews Bose voluntarily assumed the increased risk of injury from defamatory falsehood which naturally followed.

Based on the foregoing analysis under *Gertz* and *Bruno & Stillman,* the Court rules that Bose is a public figure, at least with respect to the limited issues of the characteristics and quality of the Bose 901. Consequently, the plaintiff is required to show, by clear and convincing proof, that the false statements published by the defendant were published with the knowledge that they were false or with reckless disregard of their truth or falsity.

**39.** "The first remedy of any victim of defamation is self-help—using available opportunities to contradict the lie or correct the error and thereby to minimize its adverse impact on reputation. Public officials and public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 344, 94 S.Ct. 2997, 3009, 41 L.Ed.2d 789 (1973) (footnote omitted). Whether this factor is to be accorded substantial weight is open to question in view of the following statement in *Reliance Insurance Co. v. Barron's,* 442 F.Supp. 1341 (S.D.N.Y.1977), which was quoted with apparent approval by the court in *Bruno & Stillman, supra,* 633 F.2d at 589, n.5.
"The 'access to media' argument is no more than a makeweight. There are many public figures who are so scorned and reviled by the media as to have little or no access for purposes of counteracting a libel. These remain yet public figures." *Reliance Insurance, supra,* at 1348.

**40.** "Even if the foregoing generalities do not obtain in every instance, the communications media are entitled to act on the assumption that public officials and public figures have voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 345, 94 S.Ct. 2997, 3009, 41 L.Ed.2d 789 (1973).

**41.** In February 1971 CU published an advertisement for *Consumer Reports* (PX–19) which included a number of illustrations of unhappy consumers, dissatisfied with their purchases because they had not read *Consumer Reports* before making their purchases. Each was identified by a first name and a last initial which was the first letter of the first name: Ann A., Bill B., etc. The advertisement depicted a woeful consumer, identified as Frank F., with a pair of loudspeakers that were obviously not Bose 901 loudspeakers. The plaintiff, perhaps exhibiting a certain degree of oversensitivity, contends that CU deliberately selected "Frank F." to go with the illustration of loudspeakers as a slap at Frank Ferguson, who was then president of the plaintiff. The plaintiff did not present any proof that a significant number of consumers were aware of Ferguson's status as president of the plaintiff, nor did it offer any evidence to show what harm the advertisement could have caused the plaintiff. In these circumstances the Court finds that CU did not publish the advertisement (PX–19) with Frank Ferguson in mind or with the intention of making a veiled reference to the plaintiff.

*Motivation*

A significant portion of the testimony at trial concerned Seligson's motivation to disparage the Bose 901. Motivation, of course, is not an element of the tort of product disparagement. In this case, however, the defendant suggests that the absence of any possible motive to disparage militates strongly against a finding of actual malice. Most of the testimony focused on the effect of Seligson's patent on his own evaluation of the Bose 901. According to the plaintiff, if the Seligson patent had ever been commercialized[42] it would have competed directly with the Bose 901 in the marketplace. The plaintiff claims that the desire to head off such prospective competition provided the motivation for Seligson to downgrade the Bose 901.

The defendant disputes the plaintiff's suggestion that Seligson's patent provided a motive for downgrading the plaintiff's product and offers the following three arguments to support its position. First, Lefkow, as well as Seligson, approved the Article and Lefkow had no reason to downgrade the Bose 901. The plaintiff responds that Lefkow, as Seligson's friend and subordinate, had reason to acquiesce in Seligson's decision to disparage the Bose 901. Second, Seligson had no reason to single out the Bose 901 for criticism, rather than any other loudspeaker system, if his intent was simply to smooth the way for his own product. The plaintiff counters this argument by suggesting that Seligson recognized that the Bose 901 was the best loudspeaker system on the market and therefore naturally aimed his attack at the Bose 901. Third, according to the defendant, by the time of the loudspeaker tests in November 1969, Seligson had lost all interest in developing a commercial product from his invention. The plaintiff relies on Seligson's execution of the Menden Agreement to refute the suggestion that Seligson had lost all interest in commercializing his patent. In the plaintiff's view, if Seligson had really lost all interest in commercializing his patent, he would never have spent so many hours working to produce the model called for by the Menden Agreement.

Having reviewed the record and considered the demeanor of the witnesses involved, especially that of Seligson, the Court finds that the possible commercialization of his own patent did not influence Seligson's evaluation of loudspeakers for the Article. Specifically, the Court finds that Seligson did not downgrade the Bose 901 in order to smooth the way for his own invention.

It does not necessarily follow from this finding, however, as the defendant suggests, that Seligson therefore had no reason at all to downgrade the Bose 901. The record discloses at least two other influences that could have caused Seligson to make deprecatory comments about the Bose 901. First, the plaintiff suggested, but presented scant proof, that the defendant's magazine has a built-in bias against higher-priced products because it claims to save money for consumers. According to the plaintiff, such a bias would lead the defendant to disparage higher-priced products such as the Bose 901. Second, according to Dr. Bose, the defendant's executive officer, Walker Sandbach, stated that CU resorts to the use of "sarcasm" and "spice" in order to boost circulation. Dr. Bose testified, without contradiction, that the defendant's officers told him that a survey supported their belief that consumers read *Consumer Reports* for entertainment rather than for product information. Dr. Colston Warne, the chairman of CU's board of directors, told Dr. Bose that the readers of *Consumer Reports* "love to read about vermin hair in Campbell soup."[43] The desire to inject a little "sarcasm" and "spice" is another pos-

---

**42.** There was uncontradicted testimony to the effect that Seligson's patent had not been commercialized as of the time of trial. Tr. 8–59.

**43.** Tr. 3–14. Florman referred to CU's editorial process as treading "the fine line between a strictly technical presentation and a readable report intended for laymen." PX–33, p. 3.

sible motivation for Seligson's attribution of grotesque qualities to the Bose 901.

Thus, although the Court has found that Seligson's patent did not motivate him to downgrade the Bose 901, the Court cannot justifiably say that there was no possible reason for Seligson to disparage the Bose 901. Consequently, the Court will not indulge the inference, suggested by the defendant, that because there was no motivation to disparage, there could be no actual malice.

### Actual Malice

In any case in which the actual malice standard is applicable the plaintiff bears the heavy burden of proving that the defendant published false statements with a "high degree of awareness of their probable falsity." *Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964). "There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1967). Despite its formidable burden, the plaintiff in this case has consistently maintained throughout the pendency of this action that it would be able to show, with clear and convincing proof, that the statements in the Bose 901 Portion of the Article were published by CU with the knowledge that they were false or with reckless disregard of their truth or falsity.

The plaintiff contends that, because the statement about wandering instruments which appeared in the Article conflicted directly with the testimony of Seligson and Lefkow concerning their observations, both Seligson and Lefkow must have known that the statement in the Article was false. The plaintiff does not ask the Court to infer the existence of actual malice from falsity

alone, but to couple the falsity of the statement with the fact that Seligson and Lefkow, who made the actual observations, must have known that the statement was false.

To rebut the inference of actual malice which the plaintiff seeks to establish, the defendant places great emphasis on the testimony of Seligson and Lefkow, who consistently professed their good faith belief in the accuracy of the Article as written. Because Seligson wrote the words upon which the false statement in the Article was based, it is his state of mind that is critical.[44] On cross examination Seligson testified as follows concerning the "instruments" that "tended to wander about the room."

Q. Mr. Seligson, why did you use the words "tended to wander about the room" to describe what you have drawn on the board?

A. Well, I don't know what made me pick that particular choice of words. Would you have been more satisfied if we said "across"—I think not—instead of about. I have the feeling you would have objected in either event. The word "about" meant just as I drew it on the board. Now, I so testified in my deposition—Tr. 9–153.

Thus, according to Seligson, the words used in the Article—"About the room"—mean something different to him than they do to the populace in general. If Seligson is to be believed, at the time of publication of the Article he interpreted, and he still interprets today, the words "about the room" to mean "along the wall." After careful consideration of Seligson's testimony and of his demeanor at trial, the Court finds that Seligson's testimony on this point is not credible. Seligson is an intelligent person whose knowledge of the English language cannot

---

**44.** The members of CU's editorial department would naturally have to rely on Seligson's representations that a panel had heard instruments that "tended to wander about the room." Lefkow testified that the Article as a whole accurately reflected CU's test data. Neverthe-

less, to the extent that Lefkow, as Seligson's subordinate and friend, would be expected to substantiate Seligson's position, right or wrong, his testimony can be discounted. In addition, Lefkow was never specifically questioned about the critical words "about the room."

be questioned. It is simply impossible for the Court to believe that he interprets a commonplace word such as "about" to mean anything other than its plain, ordinary meaning.

Based on the above finding that Seligson's testimony to the contrary is not credible, the Court further finds that at the time of the Article's publication Seligson knew that the words "individual instruments . . . tended to wander about the room" did not accurately describe the effects that he and Lefkow had heard during the "special listening test." Consequently, the Court concludes, on the basis of proof which it considers clear and convincing, that the plaintiff has sustained its burden of proving that the defendant published a false statement of material fact with the knowledge that it was false or with reckless disregard of its truth or falsity.

### Lanham Act and Unfair Competition

██ Count I of the complaint in this action alleges unfair competition. Count II of the complaint charges that the defendant violated Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1976), by misrepresenting the nature of its own goods—*Consumer Reports* magazine. The alleged misrepresentation that provides the basis for the claims made in both Counts I and II is CU's statement, contained in each issue of *Consumer Reports*, including the May 1970 issue, that "CU pledges that any opinions entering into its Ratings of products shall be as free of bias as it is possible to make them." [45]

According to the plaintiff, Seligson's patent on a prospectively competing loudspeaker system introduced bias into CU's ratings of loudspeakers, thus causing CU's statement to be false. The Court has already found, *supra*, p. 39, that Seligson's patent did not influence his rating of the tested loudspeakers and specifically did not influ-

ence his rating of the Bose 901. Although the plaintiff also suggested that *Consumer Reports* has a built-in bias against higher-priced products, it offered insufficient evidence on this issue to warrant a finding that CU was biased.

After a careful review of the testimony at trial, the Court concludes that the plaintiff has not satisfied its burden of proving by a preponderance of the evidence that bias in fact entered into CU's ratings of loudspeakers. The matter is still entirely within the realm of speculation. Accordingly, judgment will be entered for the defendant with respect to Counts I and II of the complaint.

### Conclusion

The Court has ruled that the plaintiff has not sustained its burden of proof on Counts I and II of the complaint. Judgment will therefore be entered for the defendant with respect to those Counts. The Court has also ruled that the plaintiff has sustained its burden of proving, with clear and convincing proof, that the defendant published a false statement of material fact with the knowledge that it was false or with reckless disregard of its truth or falsity. Therefore, with regard to Count III of the complaint, which alleges a claim of product disparagement, judgment will not be entered for either party until a separate trial is held on the issue of damages.

45. The defendant did not argue, based on a literal reading of the above-quoted language, that the pledge to be free from bias applies only to rated products and not to products such as the Bose 901, which was not "formally rated."