**BOSE CORPORATION, Plaintiff,**

v.

**CONSUMERS UNION OF U. S., INC., Defendant.**

Civ. A. No. 71–481–C.

United States District Court,
D. Massachusetts.

Dec. 30, 1981.

Blair L. Perry, Hale and Dorr, Boston, Mass., Charles Hieken, Waltham, Mass., for

Michael N. Pollet and Marshal Beil, Karpatkin, Pollet, Delibert & Beil, New York City, for defendant.

## OPINION

CAFFREY, Chief Judge.

This is a civil action, brought to obtain money damages and other relief for false statements published by the defendant about the plaintiff's product. This opinion supplements an opinion filed by the Honorable Anthony Julian, Senior United States District Court Judge and reported as *Bose Corporation v. Consumers Union of United States, Inc.*, 508 F.Supp. 1249 (D.Mass.1981). This opinion constitutes the Court's findings of fact and conclusions of law with respect to the damages issues in the case and renders a final judgment for the plaintiff on the product disparagement claim.

### Summary of Prior Proceedings

The plaintiff, Bose Corporation (Bose), a manufacturer of loudspeaker systems and other audio equipment, brought this civil action in 1971 against the defendant, Consumers Union of United States, Inc. (CU), a consumer product-testing and reporting organization. Bose claimed product disparagement, unfair competition, and Lanham Act violations on the basis of the defendant's publication of a rating of the plaintiff's product, the Bose 901 Series loudspeaker system, (the Bose 901). Judge Julian severed the issue of liability from the other issues in the case and ordered that a trial be held to determine damages only in the event that the plaintiff prevailed on the other issues. 508 F.Supp. 1249 at 1251.

After an extended trial on the liability issues, the Court ruled that the plaintiff had failed to prove allegations of unfair competition and Lanham Act violations. Accordingly, the Court entered judgment for the defendant with regard to counts I and II of the complaint. With regard to the claim of product disparagement, the Court ruled that the plaintiff had proved that the defendant published a false statement of material fact with the knowledge that it was false or with reckless disregard of its truth or falsity. *Id.* at 1277.

The second half of this nonjury trial, considering the damages issues only, was held before the undersigned on June 4, 5, and 8, 1981. The following findings of fact and conclusions of law are based on evidence introduced at that trial. Together with Judge Julian's findings, these findings represent final disposition of the case.

### Summary of Findings on Liability

*The Consumer Reports Article*: On pages 272 through 279 of the May 1970 issues of Consumer Reports CU published an article entitled "Loudspeakers" (the Article). The Article contained CU's evaluation of the quality and performance of twenty-four different loudspeakers based on CU's tests of the loudspeakers. In a section (the Bose 901 Portion) boxed off from the main body of the Article, under the heading "Some loudspeakers of special interest," appeared comments about the Bose 901. *Id.* at 1252.

The Article contained some complimentary statements about the Bose 901, but the effect of that language is more than outweighed by other statements that are clearly critical of the Bose 901. *Id.* at 1260. The Court specifically noted that the following paragraph undercut the positive impact of the Article:

But after listening to a number of recordings, it became apparent that the panelists could pinpoint the location of various instruments much more easily with a standard speaker system than with the *Bose* system. Worse, individual instruments heard through the *Bose* system seemed to grow to gigantic proportions and tended to wander about the room. For instance, a violin appeared to be 10 feet wide and a piano stretched from wall to wall. With orchestral music, such effects seemed inconsequential. But we think they might become annoying when listening to soloists. On an impulse, we also played some monophonic records through the *Bose*. To our surprise, they too acquired the same special openness and size distortions as the stereo records.

*Id.* at 1260 n.20. See *Id.* at 1252–1254 for the complete text of the Bose 901 portion of the article. Judge Julian concluded that the Article, when read as a whole is disparaging.

Isolating statements in the Article for purposes of determining liability, Judge Julian found that while CU's use of the words "panel" and "panelists" was misleading, it did not cause harm to the plaintiff. *Id.* at 1260. Likewise, the Court found that the false implication that the accuracy of the tested loudspeakers was determined in an objective manner did not harm the plaintiff. *Id.* at 1262. CU's rating of the Bose 901 as "between the high- and medium-accuracy groups" was found to be only an opinion which cannot be proven true or false. *Id.* at 1262. *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339, 94 S.Ct. 2997, 3006, 41 L.Ed.2d 789 (1974).

The Court made no finding as to whether the impact of that rating was harmful to the plaintiff.

### Power Requirements

With respect to the power requirements of the Bose 901, the Article stated: If you do consider buying the system, note well this fact: The *Bose* requires a rather gigantic amount of power. CU recommends you have an amplifier of 50 watts per channel for the deepest base response. *Id.* at 1263.

Judge Julian found that on the truth of this issue, neither party had produced trustworthy evidence. On the basis of the record he found that the matter was entirely within the realm of speculation, and that accordingly, plaintiff had failed to sustain its burden to prove the statement was false. *Id.* at 1263–1264.

### Size and Movement

The bulk of the testimony at the first proceeding concerned the paragraph quoted above, which Judge Julian found undercut the complimentary statements about the product and rendered disparaging the Article as a whole. The operative statement in the paragraph is "worse, individual instruments heard through the *Bose* system

seemed to grow to gigantic proportions and tended to wander about the room." Dissecting that sentence, Judge Julian found that the plaintiff had not proved that the statement about gigantic proportions was false. *Id.* at 1269. However, he found that the portion of the statement that instruments "tended to wander about the room" was both false and disparaging to the plaintiff. *Id.* at 1268. Judge Julian specifically found:

> A statement that attributes such grotesque qualities as instruments wandering about the room to the plaintiff's product could have no effect other than to harm the reputation of the product. That such a harmful effect was intended is demonstrated by the use of the word "worse" to introduce the sentence. Use of the word "worse" obviously indicates that what preceded was a deficiency but what followed would be an even greater deficiency in the product.

*Id.*

The Court also found that the subsequent statement to the effect that the wandering effect might be annoying when listening to soloists enhanced the disparaging effects of the false statement. *Id.* at 1268 n.35.

Because Dr. Bose testified that the most frequent complaints he heard from dealers and consumers concerned "the enlarged and wandering instruments and the statement about gigantic power required" the Court found that the false statement could not be considered a *de minimus* violation of plaintiff's rights. *Id.* at 1269.

Finding that the statement was false and disparaging, the Court went on to find that the defendant had not observed the required standard of care in making the statement. Applying the rigorous test enunciated in *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Court found that the plaintiff proved clearly and convincingly that the defendant published a false statement of material fact with the knowledge that it was false or with reckless disregard of its truth or falsity. *Id.* at 1277. The remain-

ing issue is what relief is to be granted the plaintiff.

## Scope of Relief

The tort of product disparagement, as distinguished from individual or corporate defamation, is a narrow cause of action. The interests protected are not those of the reputation of the corporation or the intangible concerns peculiar to individual reputation such as community standing, privacy and psychic well-being. *Bose Corporation v. Consumers Union of United States, Inc.,* 508 F.Supp. 1249 at 1270–71; *Note, Corporate Defamation and Product Disparagement; Narrowing the Analogy to Personal Defamation,* 75 Colum.L.Rev. 963, 980–81 (1975).

■ A cause of action for product disparagement is made out only when the plaintiff has satisfactorily proved that it suffered special damages flowing from a false statement concerning the nature or quality of plaintiff's product. *Dooling v. Budget Publishing Co.,* 144 Mass. 258, 10 N.E. 809 (1887); *Marlin Firearms Co. v. Shields,* 171 N.Y. 384, 64 N.E. 163 (1902). The tort exists to provide redress only for tangible and direct pecuniary loss, a purely economic injury to which society accords a lesser value than reputational interests.

Under the law of both Massachusetts and New York "the plaintiff must allege and prove special damages—specific proof of pecuniary loss—before being entitled to recover." 508 F.Supp. at 1249 citing *Dooling* and *Marlin, supra*; see also *Drug Research Corp. v. Curtis Publishing Co.,* 7 N.Y.2d 435, 199 N.Y.S.2d 33, 166 N.E.2d 319 (1960); Restatement (Second) of Torts §§ 623A, 633 (1976).

Special damages consist of the pecuniary loss that results directly from the effect of the wrongful conduct of the defendant, in this case, lost sales and expenses necessary to counteract the effect of publication. *Id.* § 633. Lost sales are those sales which plaintiff would have made if the defendant had not disparaged the plaintiff's product.[1]

## Injunctive Relief

■ Plaintiff in this action also seeks injunctive relief to prevent republication by the defendant of the false statement and to compel the defendant to publish a retraction.

Without reaching the question whether the first amendment would permit either type of injunctive relief in an action for product disparagement against a media defendant,[2] I rule that injunctive relief is not warranted by the facts of this case. After careful consideration of the record before the Court, I find that the false and disparaging statement complained of here was published more than ten years ago; that the defendant has not since republished or threatened to republish the statement; and that the plaintiff has failed to prove that the defendant is likely to republish the statement or that the harmful effects of the defamation persist to this day and that

---

1. What sales might have been if defendant had published a highly favorable review is not the appropriate measure of damages. *See Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974). Testimony on this question was admitted at trial as relevant for its insight into the cause and effect relationship between CU reports and product sales.

2. See, *Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974). Under *Tornillo,* the government may not require "balanced" reporting consistently with the First Amendment. In that case, the Supreme Court invalidated Florida's "right-of-reply" statute. That law required a periodical which had commented unfavorably on a political candidate to provide equal space free of charge to that candidate for response. The law's imposition of a penalty because of refusal to print certain copy, the Court found, was tantamount to a prohibition of publication of specified material and, consequently, violative of the First Amendment. *Id.* at 256, 94 S.Ct. at 2838. The Court noted that its holding did not depend on whether compulsory balance imposed additional costs on the newspaper or actually restrained its publication of any material. Rather, the holding was based on the Court's recognition that the decision whether fairly or unfairly to evaluate the issues of public concern was exclusively committed to editorial control and journalistic discretion. *Id.* at 258, 94 S.Ct. at 2839.

therefore there is no need for an injunction here to protect any interest of Bose. Therefore, I rule that the scope of relief in this action for product disparagement is limited to those pecuniary damages that plaintiff proves were the result of defendant's false and disparaging statement.

### Causation

■■■ In a product disparagement case, the plaintiff must prove that special damages resulted from the publication and that the disparagement was a substantial factor in inducing others not to buy the plaintiff's product. Defendant seeks to apply the doctrine of the "libel-proof plaintiff" to bar recovery in this case. Such a plaintiff is unable to recover because defendant's libelous statements cannot cause harm to reputation in addition to the harm that is caused by truthful statement. *See, e.g., Cardillo v. Doubleday & Company*, 518 F.2d 638 (2d Cir. 1975).[3] Essentially, defendant argues that because statements in the article not found false and disparaging by Judge Julian also harmed the reputation of the Bose 901, loss of sales is not attributable to the statement that "individual instruments . . . tended to wander about the room."

Defendant's argument is inconsistent with Judge Julian's findings that the statement "could have no effect other than to harm the reputation of the product," and that the statement could not be considered a *de minimus* violation of plaintiff's rights. 508 F.Supp. 1249 at 1268–1269.

The "libel-proof plaintiff" defense should not be applied here unless defendant's non-actionable statements were the substantial reasons for a decline of sales of the Bose 901 system and, therefore, the wandering instruments statement could have had only a *de minimus* effect. Therefore on the basis of Judge Julian's findings and the record before me, I rule that there is no basis in the record of this case for a finding that other statements about the Bose 901 were responsible for any determinable amount of lost sales to plaintiff. Plaintiff thus is not precluded from recovery by the "libel-proof plaintiff" doctrine.

■■■ With respect to the false statement about the wandering instruments, I find that the causal connection between defendant's statement and the plaintiff's losses is neither speculative nor remote. Plaintiff need only prove that the defendant's false and disparaging statement was a substantial factor in causing the loss. Restatement (Second) of Torts, *supra*, § 632. The defendant may not unfairly place the burden on the plaintiff to prove that no other factor was involved or to apportion with mathematical certainty and precision the dollar amount of the injury it suffered from each particular statement. *Rombola v. Cosindas*, 351 Mass. 382, 285, 220 N.E.2d 919 (1966).

■■■ I find that Bose's contention that the wandering instruments statement caused particular damage is not a recent invention. In the liability proceeding, Dr. Bose testified that that particular statement, the statement about gigantic power requirements, and the statement about gigantic instruments were the ones most frequently cited by dealers as reasons for decline in Bose system sales. I find that given Judge Julian's finding that most consumers would not literally construe CU's statements about 12 foot violins, *Id.* at 1265–1266, the portion of the statement that instruments seemed to grow to gigantic proportions had no significant impact on Bose sales.

---

3. The *Cardillo* doctrine involves the limited reputational interest of habitual criminals. In *Buckley v. Littell*, 539 F.2d 882 (2d Cir. 1976) the Second Circuit cautioned against extending the doctrine beyond its basic factual context. *Id.* at 888–889. The *Cardillo* doctrine has been applied in product disparagement cases in recognition of the importance of First Amendment concerns over the limited reputational interests involved in this type of case. *See, e.g., Simmons-Ford, Inc. v. Consumers Union of United States, Inc.*, 516 F.Supp. 742 (S.D.N.Y.1981). In that case, the CU article contained much truthful information critical of the product's design and performance. The Court found that "the portion of the article challenged by plaintiffs could not harm their reputation in any way beyond the harm already caused by the remainder of the article." *Id.* at 750. Bose's claim here is not analogous to the claim in *Simmons-Ford*.

I find it less clear that the statement concerning gigantic power requirements had no impact on sales. I find that some portion of the pecuniary loss caused by the CU Article may possibly be attributable to that statement since most consumers owned amplifiers having power of fewer watts per channel than that suggested for use by CU. Bose attempted to counteract the effects of this statement by demonstrating that a low-power amplifier was adequate for use with the Bose 901 system. I find Dr. Bose's testimony on this point persuasive to the extent that such efforts were effective in reducing (but not eliminating) the volume of sales lost due to the gigantic power requirement statement. Accordingly, while I find that the false statement about wandering instruments had a substantial impact on the reputation of the Bose 901, I find that some *de minimus* percentage of the total harm should be attributed to this non-actionable statement.

### Other Factors

Defendant, through its witness Newell Garfield, introduced testimony attempting to show that other factors unrelated to the CU publication account for the decline in Bose sales over the relevant period. Garfield is a management consultant with no expertise in the loudspeaker industry. His highest formal education consisted of receiving a B.A. degree from Yale, majoring in Sociology and History. I find that his opinions, based on broad market data and economic surveys, were highly speculative. I find that he was retained only three months before trial and had virtually no knowledge of the actual facts in this ten year antiquity of a case. I reject, without exception, his opinions as being pure guesses, all of which are favorable to the party which paid him very substantially. The only portion of his testimony I find factual is his opinion as to the effect which the introduction of the Bose 501 speaker may have had on sales of the Bose 901. The Bose model 501 speaker was a new product introduced during the relevant sales period. The Bose 501 was described to the public as offering at lower cost many of the perform-

ance advantages of the highly acclaimed 901 system. I find that introduction of such a product could be expected to divert some would-be sales of the Bose 901 to the Bose 501. The effect on the Sales of the Bose 901 of the introduction of the Bose 501 is taken into account in the "Lost Sales" portion of this opinion. However, the defendant has made no attempt to analyze the relevant market in a manner which would persuade me to attribute to this factor more than a marginal effect in depressing sales of the higher priced speaker. Therefore, while this factor cannot be totally ignored, it does not preclude a finding that the CU publication and the false statement contained therein were the substantial cause of the decline in sales of plaintiff's product.

### Quantification

The extent to which the product's reputation was harmed in dollar terms obviously depends on the relative importance of the publication to potential purchasers about to make buying decisions. In the prior proceeding the Court found that "[t]he influence of *Consumer Reports* on consumers' buying decisions is substantial." During 1970 and 1971 *Consumer Reports* and CU had a very favorable reputation for independence, integrity, accuracy, and freedom from bias. Subscribers to *Consumer Reports* tend to make buying their decisions after consulting reports published in *Consumer Reports*, and in 1970 millions of readers relied upon the product information published in the magazine. "Many consumers would not think of making a substantial purchase without consulting Consumer Reports." *Id.* at 1252. As Dr. Bose testified, there is a direct relationship between the reputation of a loudspeaker and sales of the product. As the defendant's own "marketing expert" conceded on cross-examination, a good reputation tends to increase the sales of a product and a poor reputation tends to decrease the sales of the product.

Unlike the statement about gigantic power requirement, Bose could not minimize the effects of the false statement about "wandering instruments" because even if

potential retail purchasers could be shown that the phenomenon was not observable during in-store demonstrations, they still would be concerned about its occurrence when other recordings were played in their homes. CU refused to disclose to Bose the names of the recordings on which the CU "panelists" supposedly had heard the "wandering instruments", so Bose was unable to refute that false claim by making demonstrations using the same recordings. I, therefore, find that it is clear to a reasonable degree of certainty that the false statement about the wandering instruments was a substantial factor in dissuading a large number of consumers from buying the Bose 901 system.

### Lost Sales

Based on evidence and testimony offered at trial, I find that publication of the May 1970 *Consumer Reports* article caused a decline in the rate of growth of sales of the Bose 901 system during the last eight months of 1970.[4]

Prior to publication of the CU Article, the Bose 901 had received the best reviews which ever had been given to a loudspeaker product, and Bose had projected that 1970 sales of the Bose 901 would be approximately 150% of 1969 sales. For the months of January through April, 1970, actual sales of Bose 901 systems to dealers for resale to members of the public increased to 155% of the sales for the corresponding months of 1969. During the last eight months of the year 1970, after publication of the CU Article, sales were only 120% of sales for the corresponding months of 1969.

I find that if the defendant had not published the Article disparaging the Bose system, sales of the Bose 901 system during the last eight months of 1970 would have been at least 155% of sales made during the corresponding months of 1969; and in the last eight months of 1970 Bose would have sold at least 4,878 Bose 901 systems. Actual sales for the last eight months of 1970 were 3,780 systems. The difference is 1,098 systems. Taking into account the fact that some small portion of this decline in sales is attributable to statements about gigantic power requirements not proved to be false and that some marginal allowance must be made for market variables such as introduction of the Bose 501, I find that at least 75% of this difference (approximately 824 systems) represents a loss of sales directly attributable to the defendant's publication of the false statement that "individual instruments ... tended to wander about the room."

Bose would have realized additional net income of at least $129 per unit from the sale of each Bose 901 system which would have been sold during the years 1970–1972 in addition to the systems actually sold. The minimum gross income per system received by Bose from its dealers would have been $300 per system (assuming that the dealers took advantage of all available quantity discounts and discounts for prompt payment), and the variable costs of manufacturing, advertising, and selling the product would have been $171 per system, leaving net income of $129 from each incremental sale.

Therefore if plaintiff had sold 824 additional Bose 901 systems during the last eight months of 1970, it would have realized additional net income of $106,296.

### Expenses To Counteract False Statements

[8] With respect to plaintiff's claim for special damages for the necessary costs of attempting to counteract false statements

---

4. These findings are based on the testimony of Phyllis M. Larson, the Accounts Receivable Manager for the Bose Corporation, exhibits introduced in support of that testimony, and the testimony of Dr. Amar G. Bose. Mrs. Larson analyzed invoices of sales of the Bose 901 system from January 1, 1979, to December of 1970. The analysis excluded foreign sales, employee purchases, salesmen's purchases, dealer employees demonstration units, warranty replacements, and other no charge invoices. The totals represented net sales to dealers in the United States of Bose 901 systems for resale to the public. Dr. Bose testified as to the relationship between the sales figures compiled by Mrs. Larson and the CU article, based on his knowledge of the firm's history and the loudspeaker industry.

published by the defendant, I find: During the year following publication of the May 1970 CU Article, Dr. Bose spent at least half his working time for the plaintiff in attempting to overcome the effects of the false statement about the "wandering instruments." This included time spent in visiting Bose dealers throughout the United States and attempting to explain to dealer personnel why the phenomenon reported by CU could not have occurred. The time spent by Dr. Bose in attempting to combat the effects of the false statement otherwise would have been spent on other aspects of the plaintiff's business. His salary during that time period was $18,000 per year. Therefore the cost to the plaintiff of the time spent by Dr. Bose in attempting to combat the false statement conservatively computed was at least $9,000.

I find that plaintiff is entitled to recovery of damages in the amount of $106,296 which represents the additional net income that the plaintiff would have realized but for the publication by the defendant of the false statement about the Bose 901 system. I also find that in addition to the amount for lost sales, the plaintiff is entitled to recovery in the amount of $9,000 for expenses reasonably incurred by the plaintiff in an attempt to minimize the effects of the false statement published by the defendant about the Bose 901 system. *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 408 F.Supp. 1219, 1234–1235 (D.Col. 1976), *modified as to damages on damages on appeal*, 561 F.2d 1365 (10th Cir. 1977), *cert. dismissed* 434 U.S. 1052, 98 S.Ct. 905, 54 L.Ed.2d 805. Accordingly, judgment will enter for the plaintiff in the amount of $115,296 plus interest accrued to the date of judgment.