LIPEZ, Circuit Judge,
concurring in part and dissenting in part.
I agree with the majority that the evidence permitted the jury to find that MPT made the two most inflammatory statements about the dangers of the D-Stat Dry with actual malice. I disagree, however, that the jury’s damages verdict is sustainable, even with the proposed reduction, on the record before us. The majority treads lightly over VSI’s failure to show the loss of even one specific customer as a result of MPT’s statements. In my view, the adequacy of VSI’s proof of damages depends on whether it is entitled to the widespread dissemination exception to the special damages rule for product disparagement claims. If not, its failure to show any specific lost sales would be fatal to the *65 product disparagement cause of action, and damages would be unavailable as a matter of law. I would therefore remand the case to the district court for consideration of the exception and, hence, respectfully dissent from the damages portion of the majority’s decision.
I.
Product disparagement is a species of business tort that is often grouped with similar claims, such as trade libel or “slander of title,” as a form of “injurious falsehood.” Rodney A. Smolla, 2 Law of Defamation § 11:34 (2d ed.2009). It is well established that special damages are “an essential part of [a] cause of action for injurious falsehood,” W. Page Keeton et al., Prosser & Keeton on Torts § 128, at 970-71 (5th ed.1984), and “must always be proved,” Restatement (Second) of Torts § 623A cmt. g.; Dooling v. Budget Pub. Co., 144 Mass. 258, 10 N.E. 809, 811 (1887); Restatement (Second) of Torts § 651 cmt. b; Arlen W. Langvardt, Section 43(A), Commercial Falsehood, and the First Amendment: A Proposed Framework, 78 Minn.L.Rev. 309, 337 (1993).
To prove special damages in a product disparagement case, a plaintiff usually must show a loss of particular sales to specific customers. Prosser & Keeton on Torts § 128, at 972 (stating that the plaintiff ordinarily “must identify the particular purchasers who have refrained from dealing with him, and specify the transactions of which he claims to have been deprived”); Robert D. Sack, 2 Sack on Defamation,[:] Libel, Slander, and Related Problems § 13.1.4.6, at 13-22 (3d ed.2009); Restatement (Second) of Torts § 633 cmt. c; see also Amerinet, Inc. v. Xerox, 972 F.2d 1483, 1504 (8th Cir.1992) (dismissing disparagement claims on motion for summary judgment where “[t]he record contains no evidence of specific lost sales or of losses directly attributable to particular false statements by [the defendant]”). The strict requirement to prove lost sales ensures that the actual pecuniary harm the tort is designed to remedy did, in fact, occur. See Arlen W. Langvardt, Free Speech Versus Economic Harm: Accommodating Defamation, Commercial Speech, and Unfair Competition Considerations in the Law of Injurious Falsehood, 62 Temp. L.Rev. 903, 918 (1989) (observing that the strict special damages requirement “appears to be based on a sensible notion: the economic interests with which injurious falsehood law is concerned necessarily carry a pecuniary value”).
There is an exception to this specific lost-sales requirement where the false statement has been widely disseminated and it would be impossible to establish that the challenged statements caused specific lost sales. The Restatement explains the exception as follows:
Widely disseminated injurious falsehood may ... cause serious and genuine pecuniary loss by affecting the conduct of a number of persons whom the plaintiff is unable to identify and so depriving him of a market that he would otherwise have found. When this can be shown with reasonable certainty, the rule requiring the identification of specific purchasers is relaxed and recovery is permitted for the loss of the market.
Restatement (Second) of Torts § 633 cmt. h[7]; see also Prosser & Keeton on Torts *66 § 128, at 972-73; Amerinet, 972 F.2d at 1503-04 (noting that, where a plaintiff is unable to show loss of specific sales, “ ‘the modern view allows plaintiff to prove a general decline of business, so long as this is shown to be the result of defendant’s disparaging statements and other possible causes are eliminated’ ” (quoting Advanced Training Sys., Inc. v. Caswell Equip. Co., 352 N.W.2d 1, 7 (Minn.1984))); Fashion Boutique v. Fendi USA, Inc., 75 F.Supp.2d 235, 240 (S.D.N.Y.1999), aff'd, 314 F.3d 48 (2d Cir.2002); Charles Atlas, Ltd. v. Time-Life Books, Inc., 570 F.Supp. 150, 156 (S.D.N.Y.1983).
The exception is most plainly applicable when disparaging remarks appear in a publication that is distributed to a general audience, leaving the plaintiff unable to identify specific customers who were lost or specific individuals who might have become customers, but did not, because of the negative information communicated by the defendant. The Bose case, which ultimately reached the Supreme Court on another issue, is illustrative. See Bose Corp. v. Consumers Union of U.S., Inc., 529 F.Supp. 357 (D.Mass.1981), rev’d on other grounds, 692 F.2d 189 (1st Cir.1982), aff'd, 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). The Bose Corporation had alleged that its loudspeaker system was disparaged in an article published in Consumer Reports magazine, which was distributed to “millions of readers.” Id. at 363. It was impossible for Bose to identify the customers it had lost, and the district court permitted it to prove damages with evidence showing a decline in the rate of sales following publication of the article. Id. at 364 [8]; see also Charles Atlas, Ltd. 570 F.Supp. at 156 (involving a product disparagement claim against the publisher of a book that was sold only through mail order). The more flexible approach to damages also has been applied where the challenged statements were disseminated by means of sales literature. See Porous Media Corp. v. Pall Corp., 110 F.3d 1329, 1338-39 (8th Cir.1997).
Given Massachusetts’ consistent reliance on the Restatement in injurious falsehood cases, see, e.g., Dulgarian v. Stone, 420 Mass. 843, 652 N.E.2d 603, 609 (1995); Powell v. Stevens, No.2000-0089, 2004 WL 1047451, at *3 (Mass.Super. May 3, 2004), and the broad acceptance of the product disparagement cause of action as discussed in the treatises, a federal court applying Massachusetts law must assume that the state’s courts would follow the Restatement’s approach to the special damages rule and the widespread dissemination exception. Thus, a plaintiff asserting product disparagement in Massachusetts must show that the challenged statements caused it to lose the sales of specific customers unless wide dissemination of the statements makes it unreasonably difficult for the plaintiff to prove its damages by identifying particular losses.
II.
A. VSI’s Claim to the Widespread Dissemination Exception
VSI asserts entitlement to the widespread dissemination exception because the challenged statements were communicated through MPT’s twenty-five sales agents and key executives to many potential customers who would be impossible to *67 identify. In response, MPT emphasizes that this case does not involve a general-circulation publication, and it argues that the limited universe of customers potentially affected by its statements renders the widespread dissemination exception inapplicable.[9]
MPT is correct that the circumstances here differ in a significant way from those typically associated with the widespread dissemination exception. MPT’s twenty-five sales agents presumably know which customers they visited during the relevant time period. In addition, VSI claims that MPT’s aggressive marketing wrested away some of its existing customers in addition to discouraging new purchases, and it would therefore seem feasible for VSI to have contacted the customers it lost during that period to inquire whether MPT’s statements were a substantial factor in their decision. See Restatement (Second) of Torts § 632 (stating that publication of an injurious falsehood causes pecuniary loss if “it is a substantial factor in bringing about the loss”).
VSI asserts that it is more complicated than it may at first seem to retrieve information from specific customers. It states that, as a general matter, information about the loss of specific sales to catheterization labs is not reasonably obtainable because “there are myriad individuals at each lab to whom an MPT representative might speak” and “[t]he purchasing decisions are sometimes made by committees.” There appears to be no reason, however, why multiple individuals in the same lab could not be asked about their interactions with MPT’s sales agents. Indeed, VSI’s CEO, Howard Root, testified that VSI’s representatives “speak to doctors every day. Anyone who is in the lab using products, we ask them what are they using and why. We talk to them about what information they have on that product, what they believe about that product, what they like or don’t like about the product.” The ability to question specific customers is suggested as well in the testimony of MPT expert Eugene Ericksen, who contacted more than thirty SyvekPatch customers who had switched, at least partially, to the D-Stat Dry.
At the same time, it is apparent that, even if the statements’ impact on a number of specific customers should have been ascertainable, many potential lost sales would have been extremely difficult, if not impossible, to confirm. For example, it would be impractical to expect VSI to contact every one of MPT’s longstanding customers in search of those who had considered switching to VSI, but did not do so because of the statements. It would be similarly challenging to determine whether potential customers who ultimately purchased from a competitor other than MPT had excluded VSI from contention based on what they heard from MPT’s sales agents.
The circumstances here thus appear to involve a cause of action that embraces both a traditional claim that particular sales were lost and the exceptional claim that many other impossible-to-identify customers were likely affected by the defendant’s disparaging statements. If in *68 fact — as VSI claims — virtually no evidence of specific lost sales is accessible, the widespread dissemination exception would seem fully applicable and generalized proof of lost profits could be legally sufficient. If evidence of a number of specific losses should exist and is reasonably obtainable, however, the plaintiff should be required to produce proof of such losses in conjunction with the generalized proof of lost profits. This is so because the proof of specific losses under such circumstances is strong evidence of the causal link between the defendant’s statements and the plaintiffs harm, and such specific proof justifies reliance on the generalized proof of lost profits to establish the dollar value of the loss of market. Moreover, requiring the plaintiff to offer that customer-specific evidence, where it is reasonably available, is consistent with both the traditional strict standard of proof for product disparagement claims and the policy of flexibility underlying the widespread dissemination exception.
The widespread dissemination exception is rooted in principles of fairness, meant to accommodate plaintiffs who lack one-to-one contact with their own customers and are therefore unable to identify individual recipients of the defendant’s message. In such instances, evidence of lower-than-anticipated sales based on past performance and market conditions — where “ ‘other possible causes [for the decline] are eliminated,’ ” Advanced Training Sys., Inc., 352 N.W.2d at 7 — is realistically the only way the plaintiff can prove that the challenged statements caused it to lose customers. Where the record shows that a plaintiff has the means to prove a link between the allegedly defamatory communication and some identifiable set of lost customers, however, the rationale for allowing a plaintiff to rely solely on the general, more speculative evidence of lost sales is considerably weakened.
If the plaintiff shows cause-and-effect between the defendant’s statements and the loss of identifiable customers, the jury reasonably can draw the inference that such harm happened more widely. When such exemplar evidence should be available but is not produced — or, put another way, if the plaintiff cannot show that its identifiable customers were influenced by the defendant’s statements — the inference of causation becomes unduly speculative. The plaintiff should not be able to satisfy its burden of proof by omitting what is logically the “best evidence” of the harm it alleges. In effect, that omission renders the plaintiffs proof of causation insufficient as a matter of law. Cf. Verizon Directories Corp. v. Yellow Book USA, Inc., 309 F.Supp.2d 401, 408 (E.D.N.Y.2004) (“Verizon makes no representation that it is in the nature of its business not to have direct contact with its customers.... It would be striking if such a large organization would be unable to identify even one customer it had allegedly lost as a result of [the defendant’s] commercials.”); Fashion Boutique, 75 F.Supp.2d at 240 (rejecting applicability of the widespread dissemination exception where the plaintiff store could have interviewed customers from its list of more than 8,000 names to determine why they stopped shopping at the store).
Moreover, in an age of increasingly widespread communication of information, many companies could plausibly claim that disparaging statements about their products were widely disseminated, with the harm extending far beyond the particular customers they can reasonably identify. If every plaintiff that could show some widespread dissemination were able to avoid the requirement to prove particular losses, the exception would swallow the traditional special damage rule. On the other hand, the exception would be severely diminish *69 ed if it were unavailable to a plaintiff whose losses extended far beyond the specific lost customers it could identify.
Applying the widespread dissemination exception to plaintiffs who can identify some, but not all, of the customers who might have reacted to the defendant’s disparaging remarks is consistent with the Restatement’s description of the exception as applicable to instances where it is “impossible to identify” individuals affected by the disparagement. Restatement (Second) of Torts § 633(2); see also Sack on Defamation § 13.1.4, at 13-22. Impossibility in this context is not an all or nothing proposition. Where the extent of a plaintiffs loss is not fairly reflected in the evidence of specific lost customers because many other customers are “impossible to identify,” it is appropriate to allow a plaintiff to prove its damages with generalized evidence of “loss of the market,” Restatement (Second) of Torts § 633 cmt. h, so long as the plaintiff also produces the best available evidence of causation. The best evidence of causation, where it is reasonably obtainable, is the proof that specific customers rejected the plaintiffs product because of the defendant’s disparaging statements. Certainly, that approach reflects Massachusetts’ pragmatic attitude toward proof of damages. See, e.g., Knightsbridge Mktg. Servs., Inc. v. Promociones Y Proyectos, S.A., 728 F.2d 572, 575-76 (1st Cir.1984) (noting in a breach of contract case that “[a]ll that is required” to prove lost profits with reasonable certainty “is a reasonable basis of computation and the best evidence obtainable ”) (citing Agoos Leather Cos. v. American Foreign Ins. Co., 342 Mass. 603, 174 N.E.2d 652, 655 (1961)) (emphasis added).
I would therefore construe the Restatement and Massachusetts law to allow reliance on the widespread dissemination exception where widely published statements were also disseminated to customers whose identities are reasonably obtainable. In that circumstance, however, a plaintiff asserting product disparagement must offer evidence that the challenged statements caused the loss of some of these identifiable customers as a prerequisite to claiming damages based on a more generalized showing of lost profits. This approach is in keeping with the “modern tendency” to “requir[e] the plaintiff to be particular only where it is reasonable to expect him to do so.” See Prosser & Keeton § 128, at 972.
To apply the widespread dissemination exception as thus construed, the trial court would need to make pretrial determinations on whether evidence of specific customer losses is reasonably obtainable and how much such evidence should be presented in conjunction with the generalized proof of lost profits evidence that the widespread dissemination exception permits.[10] That evidence must be sufficient, in the particular circumstances of the case, to permit the jury to find causation. If the court decides that such evidence of specific customer losses is necessary, it will then be up to the jury to decide if the plaintiffs evidence, including the proof of specific lost sales, shows that the defendant’s statements caused all of the plaintiffs claimed losses.
B. The Missing Evidence of Specific Lost Sales
VSI presented no evidence of any specific lost sales resulting from MPT’s *70 statements. It argues that circumstantial evidence of specific lost customers was presented to the jury, however, through MPT’s witnesses, who testified about meeting with a number of identified customers and persuading some of them to change their accounts from VSI to MPT. None of this “specific” evidence links MPT’s statements to VSI’s loss of any customers. VSI cites the testimony of MPT’s marketing director, Peter Stevens, that MPT regained business from a hospital in Virginia (Crailion) that had been using the D-Stat Dry after he met with a cardiologist there. Stevens’ testimony, however, focused on his efforts to persuade the doctor that the SyvekPatch had a clinical basis. Indeed, VSI presumably could have inquired of the same cardiologist and his colleagues at Crailion about their exposure to the statements in the marketing bulletin.
VSI also points to MPT’s damages chart, claiming that it “shows multiple customers that MPT lost and then regained, presumably after its sales force or top executives spread ‘the message.’ ”[11] Although the record might support an inference that, along with touting the SyvekPatch’s scientific value, Stevens communicated false statements about the risks associated with the D-Stat Dry, the chart is not equivalent to evidence showing that a particular customer was swayed by one or more of the five challenged statements. It does not contain examples of customers whose rejection of the D-Stat Dry is explicitly linked to MPT’s disparagement or even circumstantially attributable to the statements. The chart contains no information indicating why the listed customers switched from one company to the other, and then back again. It is this kind of customer-specific evidence, describing how the disparaging statements at issue affected them, that would support a finding that many other customers were similarly affected. Without this customer-specific evidence, a jury finding that the customers reacquired by MPT returned as a result of the challenged statements, rather than for some other reason — perhaps that the D-Stat Dry did not meet their expectations— would rely on the same kind of speculative inference that must be rejected as insufficient to prove lost profits where evidence concerning specific lost sales is reasonably obtainable.
Notably, Stevens described a number of specific instances in 2004 in which he was unable to persuade lab representatives with whom he met to continue or resume using the SyvekPatch. He testified to visiting “well over 100 cath labs” in 2004, seeking to discover the reason for MPT’s sales losses and to convert customers back to the SyvekPatch. On cross-examination, he confirmed that, in “the majority of cases,” MPT lost the accounts despite his efforts-evidence that weakens the inference that statements from MPT executives were persuading customers to reject or abandon the D-Stat Dry as too risky.[12]
The record thus contains no evidence linking MPT’s statements to particular behavior by VSI customers. Indeed, in deposition testimony, VSI’s former vice president for sales, Michael Nagel, stated that *71 he was not aware of the loss of any customers or sales on account of MPT’s statements. Although VSI asserts that its CEO, Howard Root, rather than Nagel, would have received reports of lost accounts that appeared to result from product disparagement, Root also provided no specific examples. VSI apparently did not lose the only customer who is known to have received a copy of the marketing bulletin containing the five statements.
In responding to interrogatories, VSI named nine hospitals where it claimed to have lost sales because of MPT’s sales tactics. That information was not introduced at trial. The absence of evidence concerning specific customers is particularly troubling given that VSI’s generalized evidence of damages was unimpressive' — a weakness that has prompted the majority’s remittitur approach and the proposal of a reduced award.
C. The Waivers and the Remedy
Despite the deficiency in VSI’s proof of damages, MPT did not argue in the district court that VSI’s product disparagement claim was deficient as a matter of law solely based on VSI’s failure to prove particular customer losses.[13] In its motion for judgment as a matter of law at the close of the plaintiffs case, MPT argued more generally that VSI’s claimed damages were “too speculative to be recoverable as a matter of law.” Even in its post-trial motion for judgment as a matter of law or new trial, MPT argued that the damages award was legally unsupported only because “the law in Massachusetts is that a plaintiff may not establish lost profits simply by showing that it missed projections, which is the only evidence of causation VSI offered.” In its supporting memorandum, MPT further argued lack of causation by pointing to the absence of particularized evidence, asserting that VSI had failed to show “that any customer ever even heard MPT’s allegedly false statements, much less made a purchasing decision based on them” and that a lost profits claim could not be based solely on “a discrepancy between the plaintiffs sales projections and its actual sales.” The memorandum did not, however, address the widespread dissemination exception, which VSI invoked in its response.
In my view, both parties bear responsibility for the gap in the record on damages. VSI should not have presumed that it would be deemed entitled to the widespread dissemination exception, given the traditional grounding of product disparagement claims in proof of specific customer losses. Arguably, VSI should have produced evidence of specific customer losses, or established that such evidence was not reasonably obtainable, to avoid forfeiting its claim. See Prosser & Keeton § 128, at 972-73 (“It is probably still the law everywhere that [the plaintiff] must either offer the names of those who have failed to purchase or explain why it is impossible for him to do so.... ”). For its part, MPT failed to object when VSI changed its damages strategy mid-trial on the ground that the traditional special damage rule for product disparagement actions requires a showing of specific lost customers. MPT’s failure to argue that particularized proof of loss was required as a matter of law arguably forecloses reliance on that contention on appeal. Yet, oddly, VSI has not argued that MPT waived this issue.
Given the unusual circumstances and the substantial $4.5 million award, I believe *72 the most appropriate outcome is to remand the damages issue for further consideration by the district court. I do not see the problem as inadequate evidentiary support for the amount of damages; rather, I believe a preliminary issue must be resolved before any damages may be awarded. In my view, the district court must decide the threshold question of whether VSI is entitled to rely on the widespread dissemination exception — i.e., whether evidence of specific lost sales was reasonably obtainable by VSI. If the district court were to find that specific lost sales would be unreasonably difficult for VSI to identify, it could appropriately reinstate the damages award without further proceedings. If, however, the court concluded that evidence of specific customer impact was reasonably accessible, the most appropriate next step would appear to be a new trial on damages in which VSI could attempt to make the required showing.[14]
I would therefore vacate the judgment in favor of VSI and remand for such further proceedings.

. Restatement 633 provides that the asserted pecuniary loss must “result[] directly and immediately from the effect of the conduct of third persons” and that such loss “may be established” by
(a) proof of the conduct of specific persons, or
(b) proof that the loss has resulted from the conduct of a number of persons whom it is impossible to identify. *66 The pecuniary loss thus must be caused by the impact of the challenged statements on the conduct of third parties, who may be identifiable ((2)(a)) or not ((2)(b)).

. The district court in Bose did not invoke the "widespread dissemination” exception by name, but used its approach in allowing Bose to prove a decline in sales from publication of the article. See 529 F.Supp. at 364.

. It alternatively claims that VSI has not proven wide dissemination because the record shows only a single instance in which the challenged statements were actually published to a customer. That contention is unpersuasive. The fact that only one known customer was given physical possession of the marketing bulletin does not mean the statements it contained were not widely disseminated. The marketing bulletin itself urged sales agents to communicate its message "to all health care providers,” and it is a fair inference that they followed those instructions and verbally disseminated the bulletin's content, at least generally, to a large group of customers and potential customers.

. These determinations must be made pretrial because the nature of the evidence that will be required at trial depends on whether the widespread dissemination exception applies, and to what extent. This requirement is not an innovation. The availability of the exception would always have to be determined pretrial because of its effect on the damages proof at trial.

. The chart, which shows sales totals in dollars for numerous MPT customers for the years 2002 through 2007, is labeled “MPT Accounts lost as a Result of Vascular Solutions Activities.”

. Although not all of the customers Stevens visited had switched to the D-Stat Dry, VSI acknowledges that at least some of those customers were among its clientele, and that group included some who remained VSI customers despite Stevens' efforts to woo them back.

. MPT did object to VSI’s mid-trial change in its damages theory from asserting lost sales at the nine specifically identified hospitals identified in discovery to claiming a loss of market share, but it did not raise the requirements of the product disparagement cause of action as a basis for its objection.

. In that case, the district court also would need to decide how much specific lost-customer evidence must be presented in conjunction with generalized evidence of lost sales.